SMITH, Justice,
for the Court:
This appeal comes to this Court from the order of the Hinds County Chancery Court which reversed the decision of the State Health Officer to approve a Certificate of Need (CON) for construction of an obstetrical unit to River Oaks Hospital (River Oaks). River Oaks filed its application for a CON, proposing to add a total of 20 obstetrical beds, on February 23, 1993. Following public hearings and an extensive presentation of evidence, the Hearing Officer submitted to the Health Officer a lengthy report recommending disapproval of the CON based on the lack of evidence establishing a need for the project under the existing limited, but applicable Department criteria.
*565 On January 27, 1994, the State Health Officer approved the CON to River Oaks, ■with the condition imposed that River Oaks would provide twenty-five (25) percent of its care to Medicaid patients. On February 16, 1994, Mississippi Baptist Medical Center (Baptist) appealed the State Health Officer’s final order to the Chancery Court of Hinds County. On May 26, 1994, the chancellor issued his opinion finding that the order approving the CON must be reversed.
Aggrieved with the chancellor’s ruling, River Oaks and the Department of Health appeal to this Court citing the following assignments of error:
I. WHETHER THE CHANCERY COURT, IN REVIEWING THE CERTIFICATE OF NEED DECISION OF THE MISSISSIPPI STATE DEPARTMENT OF HEALTH, EXCEEDED THE PROPER SCOPE OF JUDICIAL REVIEW?
II. WHETHER THE CHANCERY COURT ERRED IN SUBSTITUTING ITS JUDGMENT ON THE DETERMINATION OF NEED FOR THAT OF THE DEPARTMENT?
III. WHETHER THE CHANCERY COURT ERRED IN ITS DETERMINATION THAT THE APPLICABLE STATUTES DO NOT ALLOW THE DEPARTMENT TO GRANT CERTIFICATES OF NEED ON ANY CRITERIA OTHER THAN NEED?
IV. WHETHER THERE WAS SUBSTANTIAL EVIDENCE TO SUPPORT THE DEPARTMENT OF HEALTH’S DECISION?
All four of the assigned issues cited warrant discussion. However, having reviewed the record and having carefully examined each issue, this Court is led to the inescapable conclusion that the Health Officer’s Decision was indeed erroneous. As determined by the chancellor, the findings of fact by the Health Officer are not supported by substantial evidence. In fact, it appears that the Health Officer dismissed the overwhelming evidence to the contrary indicating that the application criteria were not met and the CON should have accordingly been denied. The decision of the Health Officer was thus arbitrary and capricious. This Court must affirm the chancellor.

Statement of the Facts

In order to ease reference, the following terms will be used throughout this opinion: CON — Certificate of Need; Health Officer— State Health Officer, Ed Thompson; Department — the State Department of Health; Chief of Planning — Chief of the Division of Planning and Resource Development, Department of Health, Harold B. Armstrong; Staff — the staff of the State Department of Health; LDRP unit — labor/delivery/recovery/postpartum unit, the proposed project in dispute; Hearing Officer — Assistant Attorney General Ingrid D. Williams.
The hearing on the requested CON for the establishment of an LDRP unit at River Oaks commenced on June 1, 1993 before the Hearing Officer. Chief of Planning, Harold B. Armstrong, first presented a synopsis of the Staff Analysis of River Oaks’ application. Armstrong testified inter alia, that the proposed project would add a 10-bed LDRP unit and a ten bed neonatal intensive care unit to River Oaks facilities. He stated that the project was proposed at the request of “several” ob/gyn physicians who “believe that a special LDRP unit is needed in Jackson.” The Department took the position that the proposed addition of the twenty beds required a CON, because the approximate cost of ten million dollars exceeded the one million dollar threshold set out by statute. The CON application itself stated that River Oaks would provide a reasonable amount of indigent/charity care. The Staff concluded that although it was unable to determine the impact of the proposed project on existing providers, its stated opinion was that the project would not have a significant adverse impact on the ability of existing providers to provide indigent care.
Based on the foregoing information and other details in River Oaks’ application for a CON, the Staff found the application was in compliance with the State Health Plan, the *566 Certificate of Need Review Manual (1988) and rules, procedures and plans of the Department. The Staff noted River- Oaks proposed to offer 25 percent of its care to Medicaid patients and therefore recommended the project be approved that condition.
Armstrong testified to the approximate percentage of Medicaid utilization of O.B. services at the major hospitals in Jackson: 30 percent at Baptist, 57 percent at Methodist and 1-2 percent at Woman’s. Armstrong stated that although the purpose of obtaining a CON was to “avoid unnecessary duplication” of services, he did not believe that adding a fifth major provider of O.B. services in Jackson to compete for the 4,000 annual private-pay deliveries would be an unnecessary duplication of service. He testified that he and the Staff were limited in determining need for O.B. services because no specific criteria to judge need were contained in the State Health Plan. Regarding the factors that the State Health Department did consider, Armstrong stated that one factor closely examined was that Medicaid deliveries are not sufficiently reimbursed to cover a hospital’s costs. The State had increased coverage to the extent that “if you’re female and you’re pregnant, you’re covered by Medicaid for obstetrical services.” Armstrong testified that considering River Oaks’ “commitment to provide at least a minimum of 25 percent deliveries to Medicaid mothers,” the approval of their application would have a “leveling effect” on the other providers of Medicaid deliveries.
Armstrong admitted that River Oaks’ commitment to “serving the underserved” was very recent; historically its Medicaid utilization rate had never been above 3 percent in all patient categories combined. Asked whether this was a “dismal” rate, Armstrong stated it was consistent with the rates of the other hospitals, “if you don’t talk about obstetrical services.”
Asked whether it was his position that such fluctuations in patient service rates indicated a need for another O.B. provider, Armstrong responded, “Apparently they’re unhappy with some of the providers in the Jackson area.” He stated he was referring to physicians, not patients, and that this factor would have “a lot of impact” upon whether a CON was issued. Armstrong was questioned that if, hypothetically, all the physicians of a certain service moved to one area hospital which did not provide that service— surgery, for example — would that factor be legitimate justification for issuing a CON for that hospital to do surgeries, all other factors remaining unchanged? Armstrong stated it would be “one of the considerations.”
Questioned regarding the 25 percent condition imposed with the Staffs recommended approval of the CON, Armstrong testified he expected the CON to be revoked if, for example, River Oaks achieved only a 20 percent Medicaid utilization rate. However, he testified that to his knowledge, the Health Department had never revoked a CON for failure to meet a Medicaid condition. Armstrong stated any problem with enforcement of such a condition was in “getting the Attorney General’s Office to enforce the sanctions.”
Armstrong testified River Oaks’ application did not appear to consider Hinds County within its projected service area. He opined, however, that due to the close proximity of River Oaks to Hinds County there would be “a number” of patients from Hinds. Armstrong stated it was part of competition for River Oaks to emphasize it would attract patients from counties without the comprehensive services rather than those it might attract from Hinds.
Questioned whether other counties also need “state of the art” LDRP units, Armstrong replied: “In terms of whether they need it or not, it gets back to the basic question that I’m unable to address — the need for obstetrical services. We don’t have nice measures for doing that.” Armstrong was convinced that LDRP facilities, as opposed to LDR facilities were the way the industry was moving and felt it would be “good for all the counties and all the citizens to have access to this type of service.”
Armstrong reviewed a March 1992 CON application by River Oaks for a 10 bed observation unit of which the Staff recommended disapproval because it demonstrated neither need nor a reasonable amount of indi *567 gent/charity care. Armstrong testified there was a nursing shortage in the area and found River Oaks would need 51 additional registered nurses for the O.B. project; it had received 30 applications to date and intended to recruit the rest through advertising.
Questioned again on the finding of need, Armstrong suggested the existing hospitals such as Baptist and Methodist might be able to absorb any losses they would sustain if River Oaks took the projected 40 percent of the areas private pay patients from them. He stated that the Department was compelled to examine the issue of capital expenditures for newly proposed services since it was a fact that such costs are passed on to the patients. Armstrong replied, “No, sir” when asked if he saw any compelling need for adding another O.B. provider in the Jackson Metro Area. However, he repeated that the issue was access by a larger population of Medicaid patients, which River Oaks had promised to provide. He contrasted the River Oaks proposal with a new facility which might accept only private pay patients, which would not be “needed.”
Armstrong testified the Department did not accept River Oaks’ position that the proposed project would cost less than $900,000. He further stated that it appeared that River Oaks was strongly considering becoming a provider of O.B. care since 1989, although the record of earlier hearings and testimony by River Oaks’ architect denied this. Asked why the Department would accept River Oaks’ promise to provide 25 percent Medicaid services in the face of these earlier inaccurate statements, Armstrong stated the Department relied on the possibility the CON could be revoked if the condition was not met, in addition to the fact that several of the River Oaks physicians currently accepted and would continue to accept Medicaid patients. Armstrong was convinced that the Attorney General’s staff would “follow through with holding River Oaks’ feet to the fire” if necessary. He stated in the past that the situation was political, but there had been education about the CON process and it had improved.
Dr. Brooks Griffin, a Jackson OB/GYN physician since 1982, had practiced at Baptist, Woman’s and River Oaks. He stated that in 1988 and 1989 he began hearing complaints from his patients about Baptist, such as a lack of private rooms and that the nursing staff was “stretched thin.” He moved his practice primarily to Woman’s. He stated that the patients complaining were primarily private paying patients, as were most patients in his practice.
Dr. Griffin testified that he was a “limited investor” in the River Oaks Medical Office Building. He also leased his office space in the building at rent of $7,500 per month or $543,000 over the next 5 years. He testified that he purchased five shares in the limited partnership which invested in the building at a cost of $195,000. He was aware that River Oaks Hospital had an option to purchase the Medical Office Building in five years. Dr. Griffin was also a shareholder in River Oaks Hospital.
Dr. Freda Bush testified consistently with Dr. Griffin. She was an OB/GYN physician in Jackson since 1987 who delivered at both Baptist and Woman’s. She felt there was a need for increased O.B. services because “access to care for all people ... needs to be shared.” Dr. Bush had no knowledge of the occupancy rates at area hospitals; her opinion was it was either “feast or famine,” overcrowded or not at all crowded. She had always taken Medicaid patients, although her numbers had decreased at the time of the hearing because she delivered mainly at Woman’s, which had asked physicians not to “overload” the hospital with Medicaid. She testified she was earlier content at Baptist, despite overcrowding, until she decided to move her practice closer to Woman’s. Her investment in the River Oaks project was about $218,000.
Dr. Bush testified she left Baptist not for financial incentives, but due to a loss of faith in and an absence of long-range O.B. planning at Baptist and a willingness by River Oaks to take all her patients. Dr. Bush admitted she was quoted in the Clarionr-Ledger in September 1991 as commenting that “Baptist’s expansion plans are wonderful and overdue. [Sjince they’ve decided to stay in the obstetrics business they’re doing it right.”
*568 Ginny Reed stated that she was a senior nursing consultant to 100 single room maternity programs across the country. She saw the single-room concept as a trend rather than a fad since it had economic impact on the health care system. She reviewed a 1991 journal article indicating that a large group of women studied preferred the LDRP room.
Reed testified that a study of the Jackson area indicated that 56 percent of the women interviewed stated they were interested in the “family-centered maternity care” or single-room care of the LDRP unit. Fifty percent of the women interviewed were “somewhat” or “very willing” to change physicians to use this type of service and 9 out of 10 were willing to change hospitals. The report found the availability of this service would be a “drawing card for the hospital offering this option.” Reed stated that women could “shop” for the type of care they wish to receive at delivery, and that simply having a traditional bed available was not the only consideration.
Dr. Beverly McMillan testified consistently with Drs. Griffin and Bush, as did Dr. Donna Breeland. Dr. McMillan added that she felt investment in the River Oaks Medical Office Building was a good investment. She recalled she was specifically told the project would not require a CON by the Administrator of River Oaks, Al Brust.
Dr. Ed Warren testified that he was Chairman of the Board of River Oaks for the past 6 years. He testified to the development of the plan to offer O.B. services at River Oaks. He stated the view that a CON was not needed for the proposed 10 LDRP beds, 10 NICU beds and 5 postpartum beds, came from the belief that the project would cost under $1 million and that O.B. services did not require a CON. Dr. Warren stated he would be surprised to learn it cost about $2.5 million to construct a 10 bed LDRP of the proposed quality. He was aware of a June 1992 meeting with the Attorney General over a pending Show Cause order wherein it was agreed River Oaks would file a CON for the project.
Dr. Warren testified that the Board of River Oaks was certain there was a need for more O.B. providers in Jackson. He stated that the “most important thing ... was the demand of the physicians.” He agreed it was fair to say that what physicians demanded was the primary consideration of need from the hospital’s point of view. Asked if he was willing to make a commitment that River Oaks would surrender the CON, if issued, if the 25 percent Medicaid condition were not met, he replied, “No. Pm not willing to make that. We’re going to abide by the CON as it’s stated here. And if there is some problem with it, well, then we’ll come back and sit down and talk with Mr. Armstrong (Department Chief of Planning) and his staff.”
Jobie T. Melton, Jr., a partner in the Jackson office of the accounting firm of Arthur Anderson and Company, testified that he was a certified public accountant for the past 21 years. Melton stated he was asked to review the documents evidencing the transactions between River Oaks Hospital and River Oaks Medical Building Limited Partnership with respect to the medical office budding lease, and the proposed LDRP unit to determine whether the proposed project required a CON under state laws.
Melton reached three conclusions from his study of these documents: 1) several factors indicated that the lease transactions between River Oaks Hospital and the Medical Building Partnership were not at arms-length, but structured in a way to allow the hospital to circumvent the CON requirement with respect to the LDRP project; 2) the LDRP project results in capital expenditures as defined by CON laws in excess of $1 million, thus necessitating a CON; and 3) the LDRP project results in expenditures of over $1 million under generally accepted accounting principles.
Esther Jones Quinn, President of the Jackson chapter of the NAACP, read a joint statement by the Jackson and Pearl NAACP branches in opposition to the CON application. Quinn noted the statement was not made on behalf of any hospital. It read, in part: “We are fearful that approving a new, expensive obstetrical program at a private for-profit facility located in Rankin County would not improve access to medical services *569 by the poor and minorities. It is nonsensical to jeopardize the obstetrical delivery system as a whole to accommodate the small number of Medicaid reimbursed births which River Oaks says it will provide on Lakeland Drive.” The statement continued: “We think the project really represents an attempt by physicians and patients to escape from the major Jackson hospitals who do serve some poor people. Providing 300 or 400 Medicaid reimbursed births per year at River Oaks will not meaningfully benefit Jackson area Medicaid mothers who number more than 6,000 annually.” The NAACP therefore urged the Department to deny the CON.
Three women, each one a pregnant Medicaid patient, testified to their experiences the week prior to the hearing in attempting to locate an area physician to deliver their babies. Lisa O’Daniels stated she was twenty four weeks pregnant and used the Physicians Referral Line at Woman’s Hospital to locate a physician. She was given the names of Dr. Sutherland, Dr. Freda Bush and Dr. McMillan. She testified that Dr. Sutherland’s office “would see me until I told them that I was on Medicaid, and they then said they had already met quota for the month....” The staff answering the office phones of Dr. Freda Bush and Dr. McMillan, partners, informed O’Daniels “they did not accept Medicaid at all....” O’Daniels agreed that she did not personally speak with any of the three physicians, but received her information from the staff or nurses answering their phones.
Agatha Smith was given the names of the same three physicians identified above. Dr. Sutherland’s office informed her “they already accepted 1,400 others [Medicaid patients] and they had just dropped a bunch of them.” The staff at the office shared by Dr. Bush and Dr. McMillan “said that they did not accept Medicaid, and they did not know where I got my information from.” Smith also did not personally speak to the doctors, only with their staff and did not record their names.
Rufus Harris, a principal with Tribrook health care management consulting firm, testified that he had degrees in accounting and house administration and 19 years of experience in financial feasibility studies and health planning. Reviewing the CON application, the master facilities plan and the Staff analysis, Harris calculated the total adverse economic impact on the Jackson area delivery system as a whole would be $4.5 million per year in operating and capital expenses. He testified that spending “another $4.5 million for a service that is already available and accessible” in the Jackson area could put further constraints on the system.
Harris testified that in 1992, the overall occupancy rate for O.B. beds of the existing hospitals combined, was 54 percent. Accordingly, the unused occupancy was 46 percent. Asked who would pay for an additional O.B. provider to be added, Harris explained that the costs would be paid by the consumers, or Medicaid, Blue Cross, private insurance companies and “self pay” patients, patients who paid their own medical bills. Harris calculated the loss of private pay patients to Baptist if River Oaks opened an O.B. program at $2.1 million per year in lost revenues. He opined a loss of that magnitude could affect the long term viability of O.B. services at Baptist. Harris stated the average cost of delivery at Baptist was $3,400. This figure was the average of the 25 percent C-section and 75 percent vaginal deliveries. Based on River Oaks’ projections in the CON application, Harris determined that River Oaks proposed to charge an average of $4,800 per delivery. Harris calculated that the River Oaks project would thus add total costs of $4.5 million to the system as a whole and $1,400 to each O.B. patient.
Richard Johnson, also a health care planning consultant with the Tribrook group, stated he had worked in this field for the past forty years and had experience with hospitals throughout the state. Johnson stated the national trend was moving away from traditional O.B. services to LDR or LDRP facilities. He stated the latter was more expensive to operate since the costs of cross-training staff, additional equipment and storage and larger rooms were involved.
A factor which Johnson felt the Staff had ignored in recommending approval of the River Oaks CON application, and which also demonstrated a lack of need was driving *570 time, and the fact that River Oaks, Baptist and UMC [and Woman’s] are all within about 15 minutes of each other. He stated driving time was “the important factor you.look for in obstetrical cases,” and noted that Hinds County was not included in the Staffs considerations of need. Also using the figures stated in the Staff report, Johnson stated the result was that River Oaks would perform 376 Medicaid deliveries its first year, and the rest private pay, or 1,258 deliveries. Looking at the total deliveries in the area, River Oaks would be assuming 41.5 percent of the private-pay. Johnson testified taking 41.5 percent of the private pay patients from the existing hospitals “raises ... a serious question about what’s going to happen to Medicaid patients at these existing hospitals.” He explained that the existing O.B. providers could not be expected to lose such a high percentage of their paying patients and still see the same numbers of Medicaid patients with the corresponding loss of revenue. Johnson testified that he further disagreed with the projected cost of the project at $890,000; using construction indexes alone, the cost came to roughly $2.9 million. Johnson stated studies of physician-owned facilities obtained for use by congressional committees showed that in general there were higher prices charged to patients as well as over-utilization of services. He stated the public, through insurance premium increases or payment increases paid for such services. As to the choice of LDRs or LDRPs, Johnson’s experience was that the choice of the physicians or patient choice was the dictating factor. Johnson opined that the River Oaks project met none of the goals of the CON laws, including increased accessibility, improved health care, prevention of unnecessary duplication of services and cost containment.
Ron Duckworth, Senior Director of Finance at River Oaks, testified that he was aware of rent subsidies, plane trips, moving expenses and assistance with temporary and satellite offices offered as incentives to O.B. physicians to join the River Oaks staff. Questioned on services to Medicaid patients, Duckworth stated that total Medicaid revenues for the year ending April 30,1993, were 1.88 percent of River Oaks’ total revenues.
Dr. Helen Barnes testified she was an OB/GYN physician on the staff of University Medical Center since 1969. Dr. Barnes explained in her view LDRs and LDRPs were more “fashionable” in recent times, but she saw no clinical superiority in them. She felt they sometimes caused concern because physicians were not as much in control of their patient’s environment and the people who had access to the patient. Dr. Barnes stated there was no medical necessity for another O.B. provider in Jackson, reasoning that the occupancy rates at the hospitals which did provide Medicaid services, Baptist, Woman’s, Methodist and UMC, were below 50 percent and at Woman’s, only about 35 percent. She stated, “And so why would you want to build another facility to be less than 50 percent occupied?”
Dr. Barnes doubted River Oaks would meet its condition of 25 percent Medicaid deliveries. She stated unless River Oaks asked herself and the other physicians whose practices at UMC were 90 percent Medicaid to join their staff, she saw no way they could or would intend to attract these Medicaid patients. She further testified she was familiar with the two major groups of physicians who intended to practice at River Oaks: Dr. Odom’s group and Dr. McMillan’s group. She stated in her experience, in the seventeen years Dr. Odom and his associates had finished their residencies, they had not made it a practice to treat Medicaid patients, but referred them to UMC or to herself instead. The Medicaid patients those physicians did see came to them unreferred when those physicians were on-call at an area hospital and were required to see them; most often the patients would then be sent to the Health Department or to UMC for further visits. As to Dr. McMillan’s group, both Dr. McMillan and Dr. Bush previously sought out indigents and treated Medicaid patients, but since joining the River Oaks staff, Dr. Barnes noted, both had cut back on this type of care.
Dr. Carl Reddix, an OB/GYN physician, testified that he had a Master’s degree in health planning and practiced in Jackson since-1989. He had staff privileges at each *571 of the area hospitals, but delivered mainly at Methodist. It was his professional opinion that the traditional O.B. unit still showed the most efficient use of resources. He stated the main difference between the LDR and the LDRP was that the patient rested longer in the same room in the LDRP; he characterized the difference as “trivial.” He further stated the concept was all a matter of marketing.
Dr. Reddix stated that what had to be considered was the “best use of the public’s dollars” since most patients did not pay for most of their health care themselves. He stated that a lot of the hard decisions in health care issues were taken from the individual patient because the cost of providing health care had become more of a public concern. His concept of the hearing was to consider the costs the public would incur in adding more beds to an O.B. system “that’s already under-utilized or over-bedded.” He testified that the current area rate of 54 percent occupancy meant that the capacity for deliveries in Jackson could nearly be doubled without adding any additional beds.
Dr. Reddix testified that if an additional O.B. program was opened, either Baptist or Woman’s would end up closing its O.B. beds in the worst possible scenario. He stated all patients, including Medicaid, would suffer if Baptist’s thirty-four beds were closed due to the addition of ten new beds at River Oaks. Dr. Reddix testified his own practice was about 80 percent Medicaid and he had experienced no problems gaining access for his patients to either Baptist or Woman’s.
A1 Brust, Executive Director of River Oaks since 1988, testified that he believed competition among providers of health care services was one part of the health planning process, as well as controlling unnecessary duplication of expensive services.
Brust agreed there were approximately 6,000 Medicaid births in the Jackson area per year. Using the figures projected by River Oaks, of 1,300 to 1,500 deliveries in each of the first three years, Brust agreed if 25 percent or 325-375 of those were Medicaid births, those births would be only a “drop in the bucket” of the total Medicaid deliveries in the Jackson area. He stated that “it’s 325 that may be having trouble getting treatment right now,” however. Subtracting out the Medicaid births, Brust responded that the remaining private pay births, ranging from 975 to 1125 per year in the first three years, would come from the existing practices of the physicians; since the physicians currently delivered at either Methodist or Baptist, these patients would then be transferred to deliver at River Oaks instead. Brust disagreed that these patients “belonged” to the other hospitals, stating they were actually the physicians’ patients, not the hospitals.
Brust testified he did not feel removing 975 to 1200 of the private pay patients from the existing providers would adversely impact those other providers. Brust agreed that a CON River Oaks sought in 1992 was disapproved in part for failure of the hospital to provide sufficient Medicaid and charity care.
In response to questions from the Hearing Officer, Brust stated that one or two of the group of physicians which would provide O.B. services at River Oaks did not take Medicaid patients, or any significant number of them. Brust was questioned on figures which indicated that at least four of the eleven physicians in the group did little , or no Medicaid services in the past three years.
Kent Strum stated that he was Executive Director of Baptist Medical Center and had worked for Baptist since 1977. He stated that the two groups of physicians going to River Oaks left following the failure of an attempt by Baptist to purchase Woman’s Hospital in 1990, which left both the physicians and administration at Baptist frustrated; the physicians wanted immediate changes which Baptist was unable to provide at the time. He felt River Oaks’ efforts and financial incentives to physicians contributed to the situation.
On further examination, Strum concluded that there was no need for an additional O.B. provider given the current utilization rates of the existing hospitals. He found no logic in adding another O.B. provider who would provide some Medicaid services, in addition to those currently providing these services, “if we are concerned about true community *572 planning.” Strum agreed that Baptist’s consultants in 1992 determined from their projections that the greater Jackson area could not sustain another O.B. provider until sometime after the year 2000.
David Jackson, Assistant Administrator at Woman’s Hospital and the former Chief Financial Officer, stated that Woman’s Hospital became a “dedicated Medicaid provider,” signing a contract with Medicaid in March 1993. He stated that prior thereto, the Medicaid deliveries were to patients who entered through the emergency room. Jackson testified that he could commit that Woman’s would continue to do Medicaid business as long as Woman’s hospital operated, but he was unable to commit to a specific percentage, a figure he had no control over. Jackson stated that all calls for Medicaid O.B. services to the Woman’s Physician Referral service were given the names of three physicians: Dr. McMillan, Dr. Bush and Dr. Sutherland. He noted from a physician survey, identifying those doctors who agreed to accept Medicaid when asked whom they would accept “from the referral line.” Drs. Bree-land, Bush', Griffin and McMillan either declined Medicaid or stated they would accept “limited” numbers.
Jackson testified with respect to Womans’ percentage of Medicaid utilization over three years: 1992 — 5 percent; 1991 — 5 percent; 1990 — 4 percent. He agreed that this would be more than twice River Oaks’ Medicaid utilization rate of 1.88 percent. Jackson also calculated the rate of overall hospital occupancy for Woman’s: 1992 — 28 percent; in the fiscal year ending April 1993 — 24 percent. For maternity beds alone, the occupancy rate was 36 percent in 1992 and 35 percent in 1993.
William D. Lamson testified that he was a demographic analyst, a person who studied population statistics relative to specific inquiries. Lamson testified as an expert six previous times in proceedings involving CON applications in Jackson. For this proceeding, Lamson was requested by Baptist to look at any changes in population in Jackson over the past decade, and second, to look at the birth statistics for the same period in the Jackson Metro area and its Hospital Service Area. He concluded there was no reason to expect any substantial population growth in the Jackson area over the next five years. There had been no significant change in the numbers of live births in the overall area since 1981 with the exception of an increase of 400 births in 1985, and a decrease of 400 births in 1991. At the conclusion of the hearing, the Hearing Officer submitted a sixty-eight page report containing her conclusions on each of the criteria applicable to River Oaks’ CON application. Finding a lack of evidence of need for the project and the potential for significant adverse impact on the existing hospitals, the Hearing Officer found the project was not in compliance with the Department’s criteria and recommended disapproval.
The State Health Officer issued his findings and order approving the CON, emphasizing that absent the condition imposed that River Oaks would provide 25 percent of its care to Medicaid patients, the application could not have been considered.
On appeal to the chancery court, Baptist set forth its position: (1) There is no substantial evidence of objective need for the approval of the Certificate of Need granted to River Oaks for the planned obstetrical services, and (2) the State Health Officer has no statutory authority to impose a condition on the grant of a CON. The chancellor reversed the Health Officer’s decision, finding the condition attached to the approval of the CON was non-statutory and beyond the Health Officer’s authority to make; and finding there was no objective demonstrated evidence of need for the project as required.

DISCUSSION

I. WHETHER THE CHANCERY COURT, IN REVERSING THE CERTIFICATE OF NEED DECISION OF THE MISSISSIPPI STATE DEPARTMENT OF HEALTH, EXCEEDED THE PROPER SCOPE OF JUDICIAL REVIEW?
River Oaks and the Department emphasize that this Court has stayed within the traditional, limited scope of judicial review in *573 considering certificate of need cases. Mississippi State Department of Health v. Southwest Mississippi Regional Medical Center, 580 So.2d 1238 (Miss.1991), is cited as an example. Therein, the chancery court held the State Health Officer acted imper-missibly when he denied the applicant hospital’s requested CON. This Court reversed the chancellor’s decision and reinstated the Health Officer’s denial of the CON. Id. at 1238. En route to its decision, this Court emphasized its familiar standard of review of administrative schemes. It was stated:
This is a proceeding for judicial review of an administrative action, and it is important that we understand and accept what this fact implies. The Legislature has directed that an [Health Officer’s] CON order be subject to judicial review, but that it ... shall not be vacated or set aside, either in whole or in part, except for error of law, unless the Court finds that the order ... is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the ... Department ..., or violates any vested constitutional rights of any part[y] involved in the appeal. Miss.Code Ann. § 41-7-201(4) (Supp.1990). This is nothing more than a statutory restatement of our familiar limitations upon the scope of Judicial review of administrative agency decisions. Magnolia Hospital v. Mississippi State Department of Health, 559 So.2d 1042, 1044 (Miss.1990); Melody Manor Convalescent Center v. Mississippi State Department of Health, 546 So.2d 972, 974 (Miss.1989); Grant Center Hospital of Mississippi, Inc. v. Health Group of Jackson, Mississippi, 528 So.2d at 808. (courts may alter the administrator’s action only if convinced it is arbitrary, capricious or unreasonable, or is not supported by substantial evidence).
580 So.2d at 1239-40.
Baptist states no quarrel with the standard of judicial review as cited by the appellants. Baptist writes:
This Court’s scope of review is statutory and not in dispute. We contend the agency decision is not based upon objective need as required by statute. We contend the agency substituted a condition for an objective finding of need, and we contend the condition itself is irrational. The agency ruling therefore constitutes arbitrary and capricious action. Appellate courts do not hesitate to intervene when agency action is arbitrary and capricious.
Review of the chancellor’s opinion and order makes clear that the chancellor based his decision on the determination that the Health Officer’s decision was not based on the applicable criteria, was not supported by substantial evidence, and therefore, was arbitrary and capricious. The chancellor was assigned the task, within a limited scope of review, of examining the State Health Officer’s action to determine whether that action was properly taken, a duty the limits of which he clearly recognized and abided by.
Specific to orders of the Health Department, the legislature has provided as follows for judicial review of a CON order:
The order shall not be vacated or set aside, either in whole or in part, except for errors of law, unless the court finds that the order of the State Department of Health is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of 'the statutory authority or jurisdiction of the State Department of Health, or violates any vested constitutional rights of any party involved in the appeal.
Miss.Code Ann. Section 41-7-201(4).
The chancellor did not exceed the well-established scope of judicial review of a decision of an administrative agency. This issue is without merit.
II. WHETHER THE CHANCERY COURT ERRED IN SUBSTITUTING ITS JUDGMENT ON THE DETERMINATION OF NEED FOR THAT OF THE DEPARTMENT.
III. WHETHER THE CHANCERY COURT ERRED IN ITS DETERMINATION THAT THE APPLICABLE STATUTES DO NOT ALLOW THE DEPARTMENT TO GRANT CERTIFICATES OF NEED ON ANY CRITERIA OTHER THAN NEED?
Appellant’s Issues II and III address the related questions of whether the chancel *574 lor erred by “adopting an unpromulgated formula for need, and then determining that there was no need for the proposed project under that formula.” On appeal, this Court conducts a de novo review of the chancellor’s action, constrained by the same familiar standard of review under which he operated. Mississippi State Department of Health v. Southwest Mississippi Regional Medical Center, 580 So.2d at 1240.
Reviewing the Health Officer’s order, it is first necessary to determine whether he considered the application within the correct statutory framework. Like both the Staff and the Hearing Officer, the Health Officer specifically addressed the absence of criteria specific to CON applications to provide obstetrical services: “There are no obstetric-specific criteria for review of this application. Lacking a yardstick specifically for obstetrical services in the State Health Plan, I have applied, as did the staff analysis and the hearing officer, the general review criteria for acute care beds.”
State law provides:
(1) A certificate of need shall not be granted or issued to any person for any proposal, cause or reason, unless the proposal has been reviewed for consistency with the specifications and the criteria established by the State Department of Health and substantially complies with the projection of need as reported in the state health plan....
Miss.Code Ann. Section 41-7-193(1), in relevant part.
The Health Officer agreed that the criteria applied by the Staff and the Hearing Officer were those applicable to River Oaks’ CON application and adopted the findings on those criteria as his own. Those criteria, as cited by the Staff and the Hearing Officer, include:
State Health Plan Criterion 1—
Need (applicant must demonstrate an occupancy rate of 70 percent for the two most recent years at its facilities).
State Health Plan Criterion 3—
Charity/Indigent Care (applicant must affirm it will continue to provide a “reasonable amount” of charity/indigent care. “Reasonable amount” is defined in the State Health Plan as an “amount comparable to indigent care offered by other providers of the requested services within the same ... area.”)
General Review Criteria:
3 — Less Costly/More Effective Alternative Methods
4 — Economic Viability
5 — Need
6 — Accessibility
7 — Relationship to Existing Health Care System
18 — The Efficient and Appropriate Use of Existing Services
19 — Quality of Care
River Oaks argues the Health Officer’s “independent finding of need” for more obstetrical beds for Medicaid patients validly supported his approval of the CON on the condition that River Oaks provide 25 percent Medicaid services.
Whether or not there are statutorily provided criteria applicable to a specific service, in this case, obstetrics, our reading of Section 41-7-193(1) leaves no doubt that there can be no approval of any CON application where there is no demonstrated substantial compliance with the criteria determined applicable and where no evidence of need under those criteria is found to exist.
Section 41-7-193 mandates that, absent demonstrated substantial compliance with the criteria determined applicable to CON applications of the type in question, the Health Officer must deny the CON. We decline to accept River Oaks’ and the Department’s apparent position that the lack of specific criteria applicable to O.B. services, translates into the ability of the Health Officer to grant a CON based on a factor wholly unsupported by the evidence before him. Further, in the case sub judice, the means by which this end was accomplished left the Department with no viable means of enforcement of its order.
We specifically reject outright the position of River Oaks and the Department that the Health Officer may, contrary to a plain reading of the CON laws, issue a certificate *575 of need for any reason other than the applicant’s demonstrated showing of need for the proposed service.
Applying the Department’s own general review criteria for certificates of need, the Health Officer specifically found that there was no “numerical” need for more O.B. beds in this area. He did, however, cite a need for more beds available to Medicaid mothers. The Health Officer concluded River Oak’s application should be approved, despite his specific finding that without subjecting River Oaks to the condition that they perform 25 percent Medicaid services, their application could not have been considered.
This Court finds no error in the chancellor’s determination that the Health Officer’s order must be reversed based on the chancellor’s finding that the CON was improperly granted despite the lack of substantial evidence of need. Our review of the chancellor’s decision makes clear that the chancellor’s order of reversal was based on his review of the evidence with respect to the same criteria determined applicable by the Health Officer.
Issues II and III offer no basis for reversal of the chancellor’s order.
The final question for this Court becomes whether, under the applicable criteria, the Health Officer’s approval of the CON in this manner was in fact supported by substantial evidence in the record.
IV. WHETHER THERE WAS SUBSTANTIAL EVIDENCE TO SUPPORT THE DEPARTMENT OF HEALTH’S DECISION?
The history of the CON process in this state is detailed in Grant Center Hospital of Mississippi Inc. v. Health Group of Jackson, Mississippi, Inc., 528 So.2d 804 (Miss. 1988), wherein it was noted, in part:
As a general matter health care facilities could not be constructed, new health services added, or major health care capital expenditures incurred without prior approval by the designated state agency through the issuance of a certificate of need. The CON procedure was conceived as “the basic component in an overall effort to control the unnecessary capital expenditures which contribute so greatly to the total national health bill.” National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City, 452 U.S. 378, 385-86, 101 S.Ct. 2415, 2420, 69 L.Ed.2d 89, 97 (1981) quoting S.Rep. No. 96-96, at 5 (1979).
528 So.2d at 806.
Cost containment has thus been recognized by this Court as a primary purpose supporting the CON laws. This Court has further observed the important responsibility which is statutorily placed in the hands of the Health Officer and the State Department of Health:
Context is important. Our state’s health regulators have been empowered to deny Certificates of Need absent evidence the services the applicant proposes are needed and will be provided with high quality control and on a cost-effective basis_ In any new program, ... the level of likely utilization is a matter of prime concern.
Mississippi State Department of Health v. Southwest Mississippi Regional Medical Center, 580 So.2d at 1241.
Assuming momentarily that River Oaks’ application was supported by substantial evidence of need, there would arise more points for our consideration. However, that is not the case.
The Health Officer’s order was based on his findings with regard to the general review criteria determined by the Department and the Health Officer to be applicable to this particular CON application. The Health Officer’s finding of need for River Oaks to become a provider of O.B. services was specifically based on his findings of fact regarding Criteria 5, 7 and 18, all of which he found supported approval of the CON:
Criterion 5(a) reads in its entirety:
The need that the population served or to be served has for the services proposed to be offered or expanded and the extent to which all residents of the area, and in particular low income persons, racial and ethnic minorities, women, handicapped persons, and other underserved groups, *576 and the elderly, are likely to have access to those services.
Analyzing Criteria 5, the Health Officer expressly found that “there are an adequate number of beds in this hospital service area to serve the needs of all mothers delivering, including Medicaid mothers.” The record overwhelmingly supports this finding of fact. Testimony indicated overall bed occupancy rates in the area hospitals combined is just above 50 percent. Health planning consultant Johnson testified general modules of health planning indicate a 70 percent occupancy rate is normally considered. A study by Hamilton SA, planning consultants, indicated the Jackson hospital area could not sustain another provider of obstetrical services until sometime after the year 2000. Johnson also testified to the dangers associated with adding another provider of a service which intended to take a share of 40 percent, or 1300 to 1500 patients, of the existing hospitals’ share of private paying O.B. patients in exchange for treating 360 to 370 Medicaid patients. On this factor going toward “need,” the record indicates an overwhelming availability of O.B. beds for all expectant mothers.
Next, the Health Officer stated his finding that despite there being sufficient beds to handle all O.B. patients, need for another hospital to deliver babies specifically to Medicaid mothers existed. A review of the Health Officer’s findings and order shows that this is the primary finding of fact upon which approval of the CON to River Oaks was based. The Health Officer found “there is substantial evidence in the record before me that the prevailing practice at many competing hospitals in this hospital area has the practical effect of denying access to segments of the area’s population served by Medicaid.” He continued:
Although a sufficient number of beds may physically exist at surrounding facilities, I find by the weight of the substantial credible evidence that many of theses beds are not actually available to Medicaid mothers, and that there’s a genuine need for more beds in this hospital service area which will be accessible to Medicaid mothers.
In disagreeing with the Hearing Officer’s finding on this point, the distinction I make is whether the beds are actually available or not.
It’s my conclusion that if they are not accessible and available to Medicaid mothers, it is as if they did not exist for Medicaid mothers.
Upon examining Exhibit 74, we find limited Medicaid patients admitted to River Oaks Hospital during the years 1991 and 1992. In fact, most of its physicians were admitting virtually zero Medicaid patients. We are thus hard pressed to expect compliance with the 25 percent condition imposed by the Health Officer, even if there was evidence of a true access problem, which there is not. We find Dr. Barnes’ unbiased logic most persuasive on this issue.
The only possible hospital “practice” which might have been considered a “barrier” is found in testimony that from 1987 to 1990, Baptist closed its O.B. staff to new doctors in an effort to decrease all deliveries due to overcrowding. The testimony of Witness McGinnis regarding Baptist’s birth rates and Medicaid percentages thereof is most revealing on this issue. The numbers indicate that from 1987 to 90 when Baptist closed its staff to new doctors, as expected, its overall number of births declined. (1987 births — 2,198; 1990 births — 2,061) However, in those same years, Baptist’s Medicaid percentages of births continued to rise. In 1987 the percentage of Medicaid births was 17.31 percent; in 1990 — 33.3 percent). Those physicians including Drs. Griffin, Bush, and McMillan who supported River Oaks testified in that same period they moved their practices from Baptist to Woman’s. However, Woman’s at that time did not accept Medicaid patients. These figures indicate that when physicians left Baptist, the Medicaid patients continued to deliver, in increased numbers. This, the fact that the staff closure was temporary action taken 3 years prior to the application here at issue, and the fact that Woman’s in 1993 became another hospital accepting Medicaid patients, indicates there was not and is not an access problem for Medicaid patients.
The record does not support and the Health Officer does not explain what “sub *577 stantial, credible evidence” indicates that many of the available O.B. beds are not actually available to Medicaid mothers. Chief Planning Officer Armstrong was asked if he knew of “any barriers of any kind to mothers ... in Rankin County” from using the services of any of the existing hospitals. Armstrong responded, “The only barriers that I can think of that might have to do with the access question in terms of them being Medicaid beneficiaries and the physicians. Not all physicians accept Medicaid patients and that type of thing. Then it is an access question. That would be the only one.” This Court can find no testimony or other form of evidence which indicates that some or any Medicaid mothers are unable to locate a bed at an existing hospital in Jackson to deliver. Accordingly, if there is any barrier to service, it is physicians who accepted little or no Medicaid patients. Even so, there is no evidence in the record indicating that the addition of another hospital will change the practices of physicians in this regard. Not one physician testified that they had any problem admitting a Medicaid reimbursed patient to any of the metropolitan area hospitals. Equally as important, no patients testified to that either.
The testimony of Doctors Helen Barnes and Carl Reddix is particularly relevant on the issue of access for Medicaid patients. Neither of these OB/GYN physicians practice primarily at or are associated with either River Oaks or Baptist, nor do they have any invested monetary interest, thus their testimony may be presumed less biased.
Dr. Barnes testified that she had been in practice and involved in health planning in this state since the 1960’s. Her practice of over thirty years was devoted to poor people. Dr. Barnes’ practice was over 80 percent Medicaid and she stated that she delivered primarily' at Methodist and the Jackson-Hinds Birthing Center. It is also noteworthy to mention, as did the Hearing Officer, that the Department in reviewing this criteria of need did not consider that Jackson-Hinds Comprehensive Health Center is also delivering babies to Medicaid patients. Dr. Barnes never experienced a problem admitting a patient to any of the existing facilities in the metropolitan area. Dr. Barnes, when point blank asked whether she thought River Oaks could meet the 25 percent condition imposed by the Health Officer, answered, “I don’t think there’s a chance in hell.” This Court is equally without optimism.
Dr. Reddix testified he had a primary Medicaid-based practice and had experienced no difficulty gaining access to the existing hospitals with his patients. Most importantly, Dr. Reddix testified that all patients, including Medicaid, would suffer if one of the existing providers had to close its O.B. services as a result of River Oaks taking the projected share of private pay patients.
The significance of his findings of fact on this criteria is evident throughout the Health Officer’s opinion. The Health Officer emphasized:
Central to the decision is the understanding that any Certificate of Need issued would carry a condition that River Oaks provide a specific amount of care to Medicaid and indigent women and their babies. It must be understood that absent this condition, approval of their application could not be considered.
The Court finds no evidence of record to support the Health Officer’s determination that Criteria 5 — Need, was substantially supported.
The Health Officer next considered Criteria 7 — Effect of the Proposed Project on the Existing Health Care System. Again, the Health Officer determined that this criteria also supported approval of the CON, but without support from the record. The Health Officer observed:
There was some evidence presented at the hearing which suggested that this bed addition might have a detrimental effect, at least on Baptist Memorial [sic] Hospital. And that it might cause Baptist Memorial [sic] Hospital to down size or close its obstetrical unit. This assertion is some cause for concern on my part.
However, when evaluating the evidence presented against General Criterion 7, I find no evidence that there would be an adverse impact on the overall ability of Baptist or other providers of the exist *578 ing health care system to provide charity care.
The Health Officer went on to find there was “some credible evidence” to suggest that “shifting of these beds may even have a positive impact” on the other hospitals by removing some of their Medicaid patients. This would “improve the balance sheets of those hospitals, not hurt them.”
Regarding Criteria 7, we find that the Health Officer’s stated findings of fact are again contrary to the evidence presented. There was no evidence which suggested that the existing hospitals would actually be benefited by having another O.B. program added to the four which already exist. Any “evidence” which the Health Officer found to support this conclusion could not have taken into account the testimony of several witnesses who testified that in exchange for taking a projected 376 Medicaid patients from the existing hospitals to River Oaks, River Oaks also projected to shift between 1300 and 1500 private paying patients, or 41 percent of the market’s private pay patients. These figures, projections made by River Oaks, cited by the Staff and presented to the Health Officer, were not disputed and nothing to the contrary supports that there would be no significant adverse impact upon the system if another O.B. hospital were added.
Perhaps the Health Officer considered the testimony of the physicians intending to practice at River Oaks if the CON was approved; those physicians testified, as did the Planning Officer, that the Medicaid burden needed to be fairly distributed among the hospitals and that adding another hospital would level the burden even more. These unsupported statements do not constitute “substantial evidence.”
The Health Officer finally considered Criteria 18 — Efficiency and Appropriateness of the Use of Existing Services and Facilities. On this criteria, he found there was substantial evidence “that existing obstetrical services in other area hospitals are not being efficiently nor appropriately used, since a barrier exists which renders a large portion of this community’s bed capacity inaccessible to Medicaid mothers.” The Health Officer additionally found that to deliver at University Medical Center was the “only viable choice” for most Medicaid mothers. As discussed above, this Court can find no evidence which supports the existence of a barrier which serves to deny Medicaid mothers access to the other existing hospitals.
There is substantial evidence, on the other hand, which indicates that if there is any inefficient use of the existing hospitals, it is the fact that they are underutilized. River Oaks offered no evidence to dispute the evidence offered by Baptist that occupancy rates of the existing area hospitals combined is 54 percent. The obvious corollary being that 46 percent of the existing beds in our area are empty at any given time. Further, the Health Officer’s finding that Medicaid women have only UMC as a “viable option” for O.B. services is not supported by the evidence presented. Looking at the percentage of Medicaid services performed by area hospitals (in addition to UMC) showed Baptist — 30 percent; Woman’s 1-2 percent, and Methodist — 57 percent, at the time of the hearing. Medicaid mothers thus were shown to be using each of the existing hospitals, not only UMC.
Harold Armstrong, the Department’s Chief of Planning, testified to the fact that Woman’s had only become a Medicaid provider in the months prior to the hearing; he thus concludes “their commitment to serve Medicaid was yet unproven.” This Court finds that the same is true of River Oaks; other than their promise to meet the 25 percent condition attached to approval of their CON, the record indicates no objective evidence that their commitment to this condition is probable. Using the Staff’s analysis of the CON application, and the figures provided by River Oaks therein, River Oaks provided between 1.49 and 2.58 percent Medicaid services from 1990-1992. In its statement of “financial feasibility,” however, River Oaks projected it would provide only 8 percent of its care to Medicaid patients. The record does not support the Health Officer’s finding that by adding another hospital providing O.B. care to the four already in existence, “that a much more efficient and appropriate use of all existing obstetric'facilities *579 ■will ensue.” Dr. Reddix predicted the worst ease scenario would be that Baptist or Methodist would close their O.B. services in the face of losing too many private pay patients and not enough Medicaid patients to River Oaks. Common sense and pure economics, supported by the evidence, suggests efficiency does not result from adding millions of dollars in costs to the health care system to add a service already available for the stated purpose of allowing 300 to 400 Medicaid patients per year to visit that facility, while at the same time removing 41 percent of the market’s private paying patients from the existing hospitals who see the majority of Medicaid patients. Again, a thorough review of the complete record fails to offer support for the Health Officer’s findings.
This Court has stated that a “presumption of validity is attached to agency action, and the burden of proof rests with the party challenging such action.” Miss. State Bd. of Nursing v. Wilson, 624 So.2d 485, 489 (Miss.1993) (quoting Miss. Hosp. Ass’n Inc. v. Heckler, 701 F.2d 511, 516 (5th Cir.1983)). We hold that Baptist has met its burden, without question, in proving that the Health Officer’s finding of need for the proposed O.B. services of River Oaks is not supported by substantial evidence. This Court, while giving due deference to the Department of Health, will not permit unsupported observations to override the Department’s statutorily mandated application of the criteria to the evidence presented when considering approval of a CON application. “[KJeeping in mind that ‘an administrative agency cannot be vested with arbitrary and uncontrolled discretion’,” the Court must affirm the chancellor’s order reversing the decision of the Health Officer. State ex rel Pittman v. Mississippi Public Service Com’n, 520 So.2d 1355, 1358 (Miss.1987), quoting Howell v. State, 300 So.2d 774, 779 (Miss.1974).
The bottom line is that the State Health Officer’s decision lacks substantial evidence because the overwhelming factual evidence shows that there are enough O.B. beds in existence and available to all patient at our area hospitals. The chancellor correctly determined this issue. We find no merit to the issue as framed by the Department and River Oaks.

CONCLUSION

This Court has found that “[t]he objective of it all, in the final analysis, is to determine need.” HTI Health Services of Mississippi, Inc. v. Mississippi State Department of Health, 603 So.2d 848, 852 (1992). Always cognizant of our limited scope of judicial review, the Court has also observed that “although there is a presumption of regularity, and while the ‘arbitrary and capricious’ standard of review is highly deferential, it is by no means a ‘rubber stamp.’ ” Miss. State Bd. Of Nursing v. Wilson, 624 So.2d at 489. A considered and detailed review of the issues and record before us on this appeal leads to the conclusion that the Health Officer’s decision was erroneous, as correctly determined by the chancellor.
It should come as no great revelation that a showing of substantial evidence of need is required in order for an applicant to secure a certificate of need for any health care proposal to which the CON laws apply. What defines need in any given case depends upon the purpose behind the enactment of the CON laws, particular statutory provisions, where applicable, and, as in this case, a consideration of the Department’s stated general review criteria.
The Health Officer’s decision indicates he recognized the criteria applicable to River Oaks’ application. However, a review of his findings of fact when contrasted with the evidence presented, indicates those findings are not supported by substantial evidence. The Court finds that this is not a case where the Health Officer, faced with conflicting evidence, chose to credit that evidence favoring approval of the CON. Rather, it appears to this Court a situation where the Health Officer simply chose to dismiss the overwhelming evidence indicating that criteria of need were not met and the CON as a result should have been denied.
Based on a lack of substantial evidence of need to support the issuance of the CON to *580 River Oaks, this Court affirms the chancellor’s order of reversal.
JUDGMENT AFFIRMED.
HAWKINS, C.J., and SULLIVAN, PITTMAN, BANKS and JAMES L. ROBERTS, Jr., JJ., concur.
McRAE, J., concurs in result only.
DAN M. LEE and PRATHER, P.JJ., not participating.