# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-SA-00699-SCT

*RIVERBEND UTILITIES, INC.*

*v.*

*MISSISSIPPI ENVIRONMENTAL QUALITY PERMIT BOARD AND HARRISON COUNTY UTILITY AUTHORITY*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/30/2012 |
| TRIAL JUDGE: | HON. JAMES B. PERSONS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | HARRY R. ALLEN |
| | MARGARET P. McARTHUR |
| ATTORNEYS FOR APPELLEES: | LISA THOMPSON OUZTS |
| | ROY FURRH |
| | THEODORE D. LAMPTON, III |
| | JAMES C. SIMPSON, JR. |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 01/30/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., LAMAR AND PIERCE, JJ.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1. Riverbend Utilities, Inc., challenges the Mississippi Department of Environmental Quality Permit Board's decision to grant two groundwater withdrawal permits to the Harrison County Utility Authority. Finding no error, we affirm the Permit Board's decision.

**FACTS AND PROCEDURAL HISTORY**

¶2. Although the issues before this Court are limited, we find that a factual and historical background is helpful in understanding the issues presented for resolution. Following Hurricane Katrina, Governor Haley Barbour "directed that the Mississippi Department of Environmental Quality (MDEQ) develop a regional utility plan to recommend short-and long-term improvements for water, wastewater and stormwater infrastructure development" in the Counties of George, Hancock, Harrison, Jackson, Pearl River, and Stone (the Gulf Region). As a result, MDEQ contracted with the Mississippi Engineering Group, Inc. (MEG) in April 2006 to develop the Mississippi Gulf Region Water and Wastewater Plan (the Plan). On April 18, 2006, the Mississippi Gulf Coast Region Utility Act (the Act) was signed into law with the purpose of consolidating "water, wastewater and stormwater services in order to reduce costs, promote resilience in the event of a disaster, improve the quality of the natural environment, and improve the planning and delivery of quality water, wastewater and stormwater services" within the Gulf Region. Miss. Code Ann. § 49-17-703 (Rev. 2012); *see* Miss Code Ann. §§ 49-17-701 to -775 (Rev. 2012). To facilitate its purposes, the Act created the George, Hancock, Harrison,[1] Jackson, Pearl River, and Stone County Utility Authorities.[2]

¶3. In developing the Plan, MDEQ and MEG worked with stakeholders in the local communities including the "county utility authorities, public officials, . . . leadership from

_____

[1]The Harrison County Utility Authority consists of seven members: the mayors of Biloxi, D'Iberville, Gulfport, Long Beach, and Pass Christian and two members from the Board of Supervisors.

[2]Miss. Code Ann. § 49-17-703 (Rev. 2012).

2

the private sector, and state and regional agencies" in order to identify and prioritize the Gulf Region's "most critical water, wastewater, and stormwater infrastructure needs." "[O]ver 300 projects were identified that addressed the perceived infrastructure needs throughout the Gulf Region," including projects W-13 and W-15 in Harrison County. W-13 was to create a "water supply system to serve the area north of I-10, the DeLisle Community, and the cities of Pass Christian and Long Beach." W-15 was to create a "water supply system from Lorraine-Cowan Road area in North Gulfport to Lyman Community." The Harrison County Utility Authority (HCUA) received local engineering input for W-13's conceptual design from Brown and Mitchell Engineering, Inc., and for W-15's conceptual design from Knesal Engineering Services (KES).

¶4.     After a draft of the Plan was published in November 2006, "a twenty-day public comment period was provided, during which time three public meetings were conducted in the Gulf Region [and i]nput from this public comment process subsequently was integrated into the Plan." The Plan ultimately was adopted by the United States Department of Housing and Urban Development in 2007 and its adoption was not legally challenged.[3]

¶5.     The approved designs for W-13 and W-15 cover parts of Riverbend Utilities, Inc.'s (Riverbend) certificated service area.[4] Riverbend is a privately owned, public utility company that has the exclusive right "to provide water services and wastewater treatment

---

[3]The state agencies primarily involved in reviewing the Plan were the MDEQ Office of Pollution Control and the Mississippi Department of Health. Neither agency reviews applications for groundwater withdrawal permits.

[4]Riverbend did not object to W-13's or W-15's design during the Plan's public-approval process.

3

within an approximate twenty-three square mile area generally centered at the intersection of County Farm Road and Highway 53 in Harrison County, Mississippi," pursuant to a certificate of public necessity and convenience from the Mississippi Public Service Commission.[5],[6]

¶6. HCUA wanted to place two wells on land that it owned which was located in Riverbend's certificated area as a means of providing water to the infrastructure created by projects W-13 and W-15. HCUA was required to get permits for the wells from the Mississippi Department of Environmental Quality Office of Land and Water Resources (MDEQ-OLWR).[7] HCUA submitted the required applications, which Riverbend then protested.

¶7. Groundwater withdrawal permits are issued by a Permit Board created by Section 49-17-28 of the Mississippi Code.[8],[9] A hearing was held before the Permit Board on October

---

[5]***Riverbend Utilities, Inc. v. Miss. Envtl. Quality Permit Bd.***, No. C2401-10-01275, (Harrison County Chancery Court, 1st Judicial District, January 19, 2012).

[6]*See* Miss. Code Ann. § 77-3-12 (Rev. 2009) (stating "[a] certificate of public convenience and necessity issued by the Public Service Commission authorizing public utility services to or for the public for compensation in an area grants an exclusive right to the public utility to provide that service in the certificated area"). According to the Mississippi Secretary of State website, Riverbend Utilities, Inc., was created on November 1, 1995. It has had its certificate since at least 1996.

[7]*See* Miss. Code Ann. § 51-3-5 (Rev. 2003).

[8]The Permit Board was created:

[F]or the purpose of issuing, reissuing, modifying, revoking or denying, under the conditions, limitations and exemptions prescribed in Section 49-17-29: (a) permits to control or prevent the discharge of contaminants and wastes into the air and waters of the state; (b) permits required under the Solid Wastes Disposal Law of 1974 (Title 17, Chapter 17); (c) permits required under

4

13, 2009, following which the Permit Board granted HCUA's permit applications. Permit MS-GW-16614 (Permit 14) authorized a well that would provide water to W-13's infrastructure while Permit MS-GW-16631 (Permit 31) authorized a well that would provide water to W-15's infrastructure. Riverbend asked the Permit Board to reconsider its decision and requested a full evidentiary hearing. On December 11, 2009, the Permit Board notified the parties that a full evidentiary hearing was set for March 9, 2010.

---

Sections 51-3-1 through 51-3-55; (d) water quality certifications required by section 401 of the federal Clean Water Act; and (e) all other permits within the jurisdiction of the Permit Board.

Miss. Code Ann. § 49-17-28(1) (Rev. 2012).

[9]The Permit Board consists of

[T]he Chief of the Bureau of Environmental Health of the State Board of Health, or his designee; the Executive Director of the Department of Wildlife, Fisheries and Parks, or his designee; the Head of the Office of Land and Water Resources of the Department of Environmental Quality, or his designee; the Supervisor of the State Oil and Gas Board, or his designee; the Executive Director of the Department of Marine Resources, or his designee; the Head of the Office of Geology and Energy Resources of the Department of Environmental Quality, or his designee; the Commissioner of Agriculture and Commerce, or his designee; a retired professional engineer knowledgeable in the engineering of water wells and water supply systems, to be appointed by the Governor for a term concurrent with that of the Governor and until his successor is appointed and qualified; and a retired water well contractor, to be appointed by the Governor for a term concurrent with that of the Governor and until his successor is appointed and qualified. The retired professional engineer and the retired water well contractor shall only vote on matters pertaining to the Office of Land and Water Resources.

Miss. Code Ann. § 49-17-28(1) (Rev. 2012).

5

¶8.     MDEQ, HCUA, and Riverbend all submitted prefiled testimony through affidavits. MDEQ submitted testimony from Jamie Crawford,[10] the assistant director of MDEQ-OLWR. HCUA presented testimony from William T. Oakley, a consulting hydrologist for HCUA,[11] and Marlin Ladner, the vice president of HCUA. Riverbend presented testimony from Steven Day, the president and co-owner of Riverbend, and James "Jim" Elliot, a consulting civil engineer for Riverbend.[12] William "Bill" Knesal, a consulting civil engineer for Knesal Engineering Services, Inc.,[13] and Trudy Fisher, MDEQ's executive director, were also called as witnesses by Riverbend.[14]

¶9.     Knesal testified that he proposed an alternative design for W-15 that would not have placed wells in Riverbend's certificated area. Knesal claimed the original conceptual design

---

[10]Crawford has been a registered professional geologist in Mississippi since 1998. He was employed with MDEQ for twenty-four years and was with MDEQ-OLWR for fifteen of those years. He is the assistant director, and has previously been the director, of MDEQ-OLWR. His primary responsibility is to review and issue groundwater withdrawal permits. He also previously served as Chief of MDEQ's Groundwater Planning Branch and as a hydrogeologist and Chief of MDEQ-OLWR's permitting branch.

[11]Oakley is a registered professional geologist in the State of Mississippi. Prior to his consultation with HCUA, Oakley was employed by the U.S. Geological Survey's Water Resources Division for thirty-six years. He is also a member of the Mississippi Water Well Contractors Association, the Mississippi Geological Society, the National Ground Water Association, and the Mississippi Water Resources Advisory Council.

[12]Elliot is a registered professional engineer in Mississippi, Louisiana, and Kentucky with more than forty-five years experience as a professional engineer and city planner. He was an engineering officer with the U.S. Navy and has served as the CEO, principal engineer, and chief planner of Diversified Consultants, Inc.

[13]Knesal Engineering Services, Inc., was retained by MDEQ as a local engineer to provide input into the Plan.

[14]Knesal and Fisher provided their testimony live, as they were not subpoenaed by Riverbend until March 3, 2010.

was accepted instead of his alternative design so that a federal funding deadline could be met. To the contrary, Fisher testified that the conceptual design was selected for engineering reasons and that the federal funding deadline played no role in W-15's design selection. MDEQ and HCUA repeatedly objected to Knesal's and Fisher's testimony regarding the selection of W-15's design on the ground of relevance. The hearing officer allowed Riverbend to pursue its theory but ultimately found that the approval of the Plan and the selection of W-15's design were irrelevant to the appropriateness of the issuance of the groundwater withdrawal permits to HCUA.

¶10. At the hearing's conclusion, the Permit Board affirmed its decision to issue the permits to HCUA and later detailed its reasoning in a ten-page Findings of Fact and Conclusions of Law decision. Riverbend appealed the Permit Board's decision to the Harrison County Chancery Court. After hearing oral arguments, the chancery court affirmed the Permit Board's decision. Following the denial of its motion for reconsideration, Riverbend appealed to this Court and raised the following issues, which have been restated for purposes of clarity:

I.    Whether the Permit Board's decision to grant the Harrison County
      Utility Authority two groundwater withdrawal permits is sustainable.

II.   Whether the permits granted to the Harrison County Utility Authority
      violate Riverbend's certificate of public necessity and convenience
      from the Mississippi Public Service Commission.

III   Whether the Permit Board erroneously excluded documents and
      testimony from the March 9, 2010, evidentiary hearing.

¶11. Finding no error, we affirm the decisions of the Harrison County Chancery Court and the Permit Board.

7

## LAW AND ANALYSIS

¶12.   Appeals from the Permit Board "shall be considered only upon the record as made before the Permit Board."[15]   Generally, "trial courts and appellate courts will reverse the decision of an administrative agency only if the decision (1) was unsupported by substantial evidence; (2) was arbitrary and capricious; (3) was beyond the power of the administrative agency to make; or (4) violated the complaining party's statutory or constitutional right."[16] However, an agency's interpretation of a governing statute is subject to de novo review as "[t]he ultimate authority and responsibility to interpret the law, including statutes, rests with this Court."[17]

¶13.   Substantial evidence is "something less than a preponderance of the evidence but more than a scintilla or glimmer.  [This Court] is concerned only with the reasonableness of the administrative order, not its correctness."[18]

> [A]n agency must clearly explain its fact finding and reasoning for a decision in order to facilitate review by the courts.  Conclusory remarks alone do not equip a court to review the agency's findings.  Accordingly, findings on factual issues must be specific enough for the reviewing court to determine whether the decision is supported by substantial evidence.[19]

---

[15]Miss. Code Ann. § 49-17-29(5)(b) (Rev. 2012).

[16]*W.C. Fore v. Miss. Dep't of Revenue*, 90 So. 3d 572, 577 (Miss. 2012) (internal quotations and citations omitted).

[17]*Id.*

[18]*Miss. Dep't of Envtl. Quality v. Weems*, 653 So. 2d 266, 280-81 (Miss. 1995).

[19]*Sierra Club v. Miss. Dep't of Envtl. Quality Permit Bd.*, 943 So. 2d 673, 681 (Miss. 2006).

¶14. A decision "is arbitary or capricious if the agency entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[20] "[U]nreasoned preference of one by definition is arbitrary . . . .We need to know something of the costs and risks associated with each of these conflicting interests before we can on judicial review intelligently consider whether the Board acted arbitrarily or capriciously or whether its decision was supported by substantial evidence."[21]

## I. The Issuance of Harrison County Utility Authority's Groundwater Permits

¶15. The parties disagree about the requirements for a groundwater withdrawal permit. Groundwater withdrawal permits are governed by Title 51, Chapter 3 of the Mississippi Code, namely Sections 51-3-1 and 51-3-13. Section 51-3-1 of the Mississippi Code declares the State's policy on the conservation of water resources:

> It is hereby declared that the general welfare of the people of the State of Mississippi requires that the water resources of the state be put to beneficial use to the fullest extent of which they are capable, that the waste or unreasonable use, or unreasonable method of use, of water be prevented, that the conservation of such water be exercised with the view to the reasonable and beneficial use thereof in the interest of the people, and that the public and private funds for the promotion and expansion of the beneficial use of water

---

[20]*Sierra Club*, 943 So. 2d at 681 (internal citations omitted).

[21]*McGowan v. Miss. State Oil & Gas Bd.*, 604 So. 2d 312 (Miss. 1992), *cert denied* , 506 U.S. 1052, 113 S. Ct. 976, 122 L. Ed. 2d 130 (1993); *see also* **Falco Lime, Inc. v. Mayor and Aldermen of City of Vicksburg**, 836 So. 2d 711, 721 (Miss. 2002) (noting that "[w]hether a decision is arbitrary and capricious seems to have melted somewhat into the substantial evidence standard . . . a holding which is supported by substantial evidence cannot be arbitrary and capricious") (internal citations omitted).

resources shall be invested to the end that the best interests and welfare of the people are served.[22]

And Section 51-3-13 states:

Use of waters of the state shall not constitute absolute ownership or absolute rights of use of such waters, but such waters shall remain subject to the principle of beneficial use. It shall be the duty of the board to approve all applications made in such form as shall meet the requirements of this chapter and such rules and regulations as shall be promulgated by the board and which contemplate the utilization of water for beneficial purposes, within reasonable limitations, provided the proposed use does not prejudicially and unreasonably affect the public interest. If it is determined that the proposed use of the water sought to be permitted is not for beneficial purposes, is not consistent with standards established by the commission, or is detrimental to the public interest, it shall be the duty of the board to enter an order rejecting such application or requiring its modification.[23]

A list of factors for the Permit Board to consider when considering a groundwater withdrawal permit is not provided by statute or regulation.[24]

¶16.    Riverbend focuses on Section 51-3-1's mandate "that the waste or unreasonable use, or unreasonable method of use, of water be prevented." It argues that a permit should not be issued unless the applicant shows (1) that there is a present need for the water and (2) that the requested well is part of the most efficient plan to satisfy the need. The Permit Board and HCUA focus on Section 51-3-1's mandate "that the water resources of the state be put to

_____

[22]Miss. Code Ann. § 51-3-1 (Rev. 2003).

[23]Miss. Code Ann. § 51-3-13 (Rev. 2003).

[24]Effective August 26, 2013, Mississippi's environmental regulations have been renumbered and reformatted pursuant to the amended Administrative Procedures Act passed by the state legislature. The regulations have not been substantively changed. In order to correspond with the record and the parties' briefs, this opinion references the regulations by their former citations. The new citations will also be provided in the footnotes.

beneficial use to the fullest extent of which they are capable."[25] They argue that need and efficiency are irrelevant and that the Permit Board has only to consider the proposed use of the water and the withdrawal's effect on the aquifer and existing wells.

¶17.    In light of "the practical understanding that an agency far better understands its daily operations needs than the judiciary ever could,"[26] the Permit Board was given statutory authority to establish requirements for water permits by regulation.[27] The Permit Board has propounded several groundwater regulations which outline, but do not definitively establish, what the Permit Board must consider when reviewing groundwater withdrawal permit applications.[28] Regulation LW-2(II)(C) identifies the basic requirements for a groundwater withdrawal permit application:

---

[25]"Beneficial use" is defined by regulation as "the application of water, excluding waste of water, to a purpose that produces economic or other tangible or intangible benefits to the state and its citizens. Such uses include, but are not limited to, diversions or withdrawals for public, industrial, or agricultural use." Miss. Dep't of Envtl. Quality Land and Water Resources Reg. LW-2(I)(E), Surface Water and Groundwater Use and Protection ( 2 0 0 9 ) , http://www.deq.state.ms.us/mdeq.nsf/pdf/legal_11Miss.Admin.CodePt.7Ch.1./$File/11% 20Miss.%20Admin.%20Code%20Pt.%207%20Ch.%201..pdf?OpenElement (last visited Jan. 29, 2014); Miss. Admin. Code R. 11-7:1.1(E) (2013).

[26]*Wheeler v. Miss. Dep't of Envtl. Quality Permit Bd.*, 856 So. 2d 700, 704 (Miss. Ct. App. 2003).

[27]Miss. Code Ann. § 51-3-13 (Rev. 2003) (authorizing the Permit Board to establish requirements for water permits by regulation so long as the regulations "contemplate the utilization of water for beneficial purposes, within reasonable limitations, provided the proposed use does not prejudicially and unreasonably affect the public interest").

[28]*See* Miss. Dep't of Envtl. Quality Land and Water Resources Reg. LW-2, Surface W a t e r   a n d   G r o u n d w a t e r   U s e   a n d   P r o t e c t i o n ( 2 0 0 9 ) , http://www.deq.state.ms.us/mdeq.nsf/pdf/legal_11Miss.Admin.CodePt.7Ch.1./$File/11% 20Miss.%20Admin.%20Code%20Pt.%207%20Ch.%201..pdf?OpenElement (last visited Jan. 29, 2014); Miss. Admin. Code R. 11-7:1.1-1.7 (2013).

(1) The application must completely and accurately describe the purpose for the proposed use of water;

(2) Such use must not be prohibited by state or federal statutes or regulations; and

(3) The proposed source of water must be free of Commission-imposed restrictions that preclude processing of the application.[29]

Regulation LW-2(II)(C) goes on to state that "[a]pplications shall be completed using maximum volume of water required, estimated dates for initial use of the water, and estimated values for withdrawal or diversion rates."[30] The population's need and efficiency are not mentioned. Section four of Regulation LW-2 specifically addresses groundwater withdrawals:

- LW-2(IV)(B) prioritizes the uses of groundwater withdrawals as follows: 1) public supply, 2) industrial/commercial, 3) livestock, 4) enhancement of wildlife habitat and other recreational uses, and 5) other uses.[31]

- LW-2(IV)(C) addresses well spacing and provides minimum acceptable spacing distances and a means to request an exemption from the spacing requirements.[32]

---

[29]Miss. Dep't of Envtl. Quality Land and Water Resources Reg. LW-2(II)(C), Surface Water and Groundwater Use and Protection (2009), http://www.deq.state.ms.us/mdeq.nsf/pdf/legal_11Miss.Admin.CodePt.7Ch.1./$File/11% 20Miss.%20Admin.%20Code%20Pt.%207%20Ch.%201..pdf?OpenElement (last visited Jan. 29, 2014); Miss. Admin. Code R. 11-7:1.2(C) (2013).

[30]*Id.*

[31]Miss. Dep't of Envtl. Quality Land and Water Resources Reg. LW-2(IV)(B), Surface Water and Groundwater Use and Protection (2009), http://www.deq.state.ms.us/mdeq.nsf/pdf/legal_11Miss.Admin.CodePt.7Ch.1./$File/11% 20Miss.%20Admin.%20Code%20Pt.%207%20Ch.%201..pdf?OpenElement (last visited Jan. 29, 2014); Miss. Admin. Code R. 11-7:1.4(B) (2013).

[32]Miss. Dep't of Envtl. Quality Land and Water Resources Reg. LW-2(IV)©, Surface Water and Groundwater Use and Protection (2009), http://www.deq.state.ms.us/mdeq.nsf/pdf/legal_11Miss.Admin.CodePt.7Ch.1./$File/11%

• LW-2(IV)(D) identifies "once-through, non-contact cooling water" and "uncontrolled free-flowing wells"as nonbeneficial uses of water. It also states that "[t]he Permit Board may determine that other discharges/withdrawals of groundwater are not beneficial uses, constitute waste, and/or are prohibited to protect the public interest and may deny permits based on such determinations." Notably, LW-2(IV)(D) does not state that a lack of need or efficiency constitutes waste. "Waste" is not otherwise defined by statute or regulation.[33]

The structure of the Groundwater Withdrawals section is telling. It contains subsections on beneficial use, well-spacing, and limitations on water uses but no sections on need or efficiency. Also, LW-2 does not list a change in the population's needs as a reason to modify a permit.[34] Moreover, MDEQ-OLWR did not have the authority to approve or reject the engineering designs for W-13, W-15, or any other project under the Plan. Design decisions were made by the Office of Pollution Control and the Mississippi Department of Health.

¶18. In its Findings of Fact and Conclusions of Law, the Permit Board stated that it is required to consider only the following factors when reviewing a groundwater withdrawal permit:

_____

20Miss.%20Admin.%20Code%20Pt.%207%20Ch.%201..pdf?OpenElement (last visited Jan. 29, 2014); Miss. Admin. Code R. 11-7:1.4(C) (2013).

[33]Miss. Dep't of Envtl. Quality Land and Water Resources Reg. LW-2(IV)(D), Surface Water and Groundwater Use and Protection (2009), http://www.deq.state.ms.us/mdeq.nsf/pdf/legal_11Miss.Admin.CodePt.7Ch.1./$File/11%20Miss.%20Admin.%20Code%20Pt.%207%20Ch.%201..pdf?OpenElement (last visited Jan. 29, 2014); Miss. Admin. Code R. 11-7:1.4(D) (2013).

[34]*See* Miss. Dep't of Envtl. Quality Land and Water Resources Reg. LW-2(II)(G), Surface Water and Groundwater Use and Protection (2009), http://www.deq.state.ms.us/mdeq.nsf/pdf/legal_11Miss.Admin.CodePt.7Ch.1./$File/11%20Miss.%20Admin.%20Code%20Pt.%207%20Ch.%201..pdf?OpenElement (last visited Jan. 29, 2014); Miss. Admin. Code R. 11-7:1.2(G) (2013).

> [W]hether the applicant owns or controls the land upon which the groundwater withdrawal wells will be placed, . . . how the permit applicant plans to use the water, . . . the amount of water requested, . . . whether the wells will be spaced in a manner to avoid interference with existing wells, . . . and the projected drawdown of the aquifer.

In light of the applicable statutes and regulations, we find that the factors considered by the Permit Board to analyze groundwater withdrawal permits are reasonable. The Permit Board made specific findings with regard to each of the five factors, and each of its findings was supported by substantial evidence.

### 1. Ownership of Land

¶19. The Permit Board found that "HCUA and/or Harrison County own the land upon which HCUA will install the two wells for the permitted groundwater withdrawal." This finding was undisputed and was supported by the prefiled testimony of Crawford.

### 2. Use of Water

¶20. The Permit Board found that "HCUA plans to use the water for public water supply." This is the highest-ranked beneficial use of water. The Permit Board's finding was supported by the permits themselves and the prefiled testimony of Crawford.

### 3. Amount of Water

¶21. The Permit Board found that "the permits issued to HCUA allow HCUA to pump water at a maximum rate of 1,000 gallons per minute . . . [and] only allow withdrawal of up to 350,000 gallons per day per well." The Permit Board specifically found that "there is sufficient water in the aquifer to supply Riverbend's and HCUA's customers' needs." This finding was undisputed and was supported by the prefiled rebuttal testimony of Crawford.

### 4. Well Spacing

14

¶22. The Permit Board found that "the intended placement of the HCUA wells meets the regulatory recommendations for well placement . . . [and] that the placement of the HCUA wells at the permitted sites is appropriate and there is no need to require further spacing." This finding was supported by the prefiled rebuttal testimony of Crawford and the prefiled testimony of Oakley.

     5.     Drawdown of Aquifer

¶23. The Permit Board found that:

> Spacing of HCUA's wells in the permitted location should be sufficient such that aquifer drawdown will be acceptable and there should be no interference with Riverbend's existing wells. MDEQ did not specifically consider the drawdown caused by Riverbend's wells in determining the additional impact of the two HCUA wells on the aquifer. However, the water withdrawal permits Riverbend holds for its wells are for a relatively small amount of water. This area of Harrison County should not experience any heavy aquifer drawdowns in the near future.

¶24. The Permit Board went on to say "[t]here is no evidence that withdrawal of groundwater from the two HCUA wells within Riverbend's certificated area would have a material adverse effect on the availability of water in the aquifer." This finding was supported by Crawford's and Oakley's prefiled testimony.

¶25. Riverbend relies on *McGowan v. Mississippi State Oil & Gas Board*, 604 So. 2d 312 (Miss. 1992), and *Mississippi State Department of Health v. Mississippi Baptist Medical Center*, 663 So. 2d 563 (Miss. 1995), to argue that the Permit Board's Findings of Fact and Conclusions of Law are insufficient to support its decision. Both cases are distinguishable from the one at hand.

¶26.     In *McGowan*, McGowan applied to the Oil and Gas Board to renew his existing permits and to seek issuance of new permits for several packerless saltwater disposal wells.[35] After McGowan presented his case, the Board took the matter under advisement and received evidence from its staff opposing the issuance of the permits.[36] McGowan was not notified that his applications were going to be opposed and was not given access to the opposing evidence.[37] The Board denied McGowan's applications through a series of orders that failed to explain the basis for its decisions.[38] In contrast, Riverbend received a full evidentiary hearing before the Permit Board and a ten-page explanation of the Permit Board's decision.

¶27.     In *Mississippi Baptist Medical Center*, River Oaks Hospital and the Mississippi State Department of Health appealed the chancery court's reversal of the Department of Health's decision to issue River Oaks a certificate of need.[39] In affirming the chancery court's decision, this Court noted that:

> [T]his is not a case where the Health Officer, faced with conflicting evidence, chose to credit that evidence favoring approval of the CON. Rather it appears to this Court a situation where the Health Officer simply chose to dismiss the overwhelming evidence indicating that criteria of need were not met and the CON as a result should have been denied.[40]

---

[35]*McGowan*, 604 So. 2d at 314.

[36]*Id.* at 320.

[37]*Id.*

[38]*Id.* at 314.

[39]*Mississippi Baptist Medical Center*, 663 So. 2d at 564.

[40]*Id.* at 579.

The same cannot be said about the case at hand.  Here, conflicting evidence was presented about the effect and the intended use of the groundwater withdrawal permits, and the majority of the evidence supported the Permit Board's decision.  Based on the foregoing, we find that the Permit Board's decision was supported by substantial evidence, was not arbitrary and capricious, and should be affirmed.

## II.     Riverbend's Certificate of Public Necessity and Convenience

> Riverbend argues that the Permit Board's decision violates its right to be the exclusive  provider of water services in its certificated area because the two [permitted] wells and associated water mains are an "origination point " of water supply "to or for the public for compensation" and not an "extension" through its certificated area.  Riverbend relies on Miss. Code Ann. [§] 77-3-12(2) which, in sum, provides that a utility system may extend ". . . its plant, lines, or other facilities in or through the certificated area of another utility for purposes other than providing services to or for the public for compensation in such certificated area . . . ."[41]

Riverbend's certificate of public convenience and necessity gives it only the exclusive right to sell water in its certificated area.  It does not give Riverbend the exclusive right to access the groundwater underlying its certificated area.  HCUA's groundwater withdrawal permits do not allow HCUA to sell water in Riverbend's certificated area, and nothing in the record suggests that HCUA intends to do so.  In fact, HCUA repeatedly acknowledges in the record and its briefs that it cannot sell water in Riverbend's certificated area.

> Riverbend also argues that HCUA's plan to install fire hydrants adjacent to Riverbend's fire hydrants is a same or similar service provided by Riverbend and is a violation of its right to be an exclusive provider within its certificated

---

[41]*Riverbend Utils., Inc. v. Miss. Envtl. Quality Permit Bd.*, No. C2401-10-01275, ¶ 15 (Harrison County Chancery Court, 1st Judicial District, filed January 19, 2012) (quoting Miss. Code Ann. § 77-3-12(2) (Rev. 2009)).

area . . . . Any water taken from HCUA fire hydrants will be without charge to residents of Riverbend's certificated area.[42]

Section 77-3-12 prohibits HCUA only from providing a similar service in Riverbend's certificated area *for compensation*.[43] Again, nothing in the record suggests HCUA intends to use its groundwater withdrawal permits to sell water in Riverbend's certificated area for compensation. Rather, the record suggests that HCUA intends to expand its regional water system by building wells on land that it owns in Riverbend's certificated area and selling water to customers outside of Riverbend's certificated area. HCUA's plan is permissible.

¶28. Riverbend's contention with HCUA stems from failed negotiations between the parties regarding the treatment of Riverbend's wastewater. Riverbend blames HCUA for its inability to get a wastewater permit for its certificated area. MDEQ denied Riverbend's wastewater permit request and told it to coordinate with HCUA. HCUA refuses to treat Riverbend's wastewater unless Riverbend agrees to buy "wholesale" water from it, which Riverbend could then mark up and sell to the residents in its certificated area at "retail" prices.

¶29. Riverbend argues that the parties' wastewater negotiations illustrate HCUA's intent to take its property – the exclusive right to sell water in its certificated area – without just compensation. HCUA and the Permit Board claim that the parties' wastewater negotiations are irrelevant to the sustainability of the Permit Board's decision to issue HCUA two groundwater withdrawal permits. We agree with HCUA and the Permit Board. The Permit Board's decision does not violate any right of Riverbend and is affirmed.

---

[42]*Id.*

[43]Miss. Code Ann. § 77-3-12(2) (Rev. 2009) (emphasis added).

## III.    The Hearing Officer's Evidentiary Rulings

¶30.    Riverbend subpoenaed Mississippi Engineering Group ("MEG") on February 24, 2010, and MDEQ, HCUA, Knesal Engineering Services, Inc., and Brown and Mitchell Engineering, Inc., on March 3, 2010.[44]  All five subpoenas sought evidence regarding the Plan and W-13 and W-15.  Riverbend requested documents from all the subpoenaed parties but MDEQ and commanded a witness be produced on behalf of all the subpoenaed parties but MEG.

¶31.    On March 9, 2010, at the outset of the evidentiary hearing, MDEQ moved to quash all five subpoenas, arguing the requests were untimely, given that they were issued so close to the hearing.  MDEQ also claimed that the evidence sought by the subpoenas was irrelevant. The hearing officer allowed the subpoenaed witnesses to testify but prohibited them from testifying "to items of evidence that may be contained in those subpoenas that [we]re not

---

[44]The MEG subpoena commanded it to produce "[a]ny correspondence, emails or documents of any description relating to Projects W-13 and W-15 of the Mississippi Gulf Regional Water and Wastewater Plan of MDEQ, including but not limited to plans, specifications and design data sheets, including but not limited to conceptual and design data . . . on or before March 8[, 2010] at 9:30 a.m."

The subpoenas to MDEQ, HCUA, Knesal Engineering Services, Inc., and Brown and Mitchell Engineering, Inc., asked each party "to produce one or more knowledge persons on its behalf" to give evidence regarding:

> The Gulf Regional Water and Wastewater Plan prepared by Mississippi Engineering Group; the Conceptual Design Booklet prepared by Mississippi Engineering Group on Project W-13 and W-15; Water Well Permit Nos. MS-GW-16614 and MS-GW-16631; all correspondence or emails exchanged between [the subpoenaed parties], HUD, and MDA, related to the foregoing subject matter.

The subpoenas to HCUA, Knesal Engineering Services, Inc., and Brown and Mitchell Engineering, Inc., also ordered the parties to produce to Riverbend the aforementioned correspondence and emails before March 8, 2010, at 9:30 a.m.

already in the record" before the hearing. Riverbend claims that the hearing officer abused his discretion in excluding evidence not produced prior to the hearing, while the Permit Board argues that the hearing officer's rulings were acceptable. We agree with the Permit Board.

¶32. The parties were notified of the discovery deadlines for the March 9, 2010, evidentiary hearing on December 11, 2009. Notably, the deadline for prefiled direct testimony was February 5, 2010, the deadline for prefiled rebuttal testimony was February 22, 2010, and the deadline for producing exhibits was March 2, 2010.[45] Despite having three months' notice of the hearing, Riverbend waited to issue the disputed subpoenas until after the prefiled rebuttal testimony and exhibit production deadlines and less than a week before the hearing. The Permit Board's prefiling procedures are intended to expedite evidentiary hearings, and the hearing officer acted within his discretion when he prevented Riverbend from undermining the procedures' intent with a series of last-minute subpoenas. Additionally, the subpoenaed evidence was irrelevant, as it pertained to the approval process for the Plan and W-1's design, neither of which had bearing on the Permit Board's decision to issue HCUA two groundwater withdrawal permits. Finding no error, we affirm the judgment of the Harrison County Chancery Court and the decision of the Mississippi Environmental Quality Permit Board.

---

[45]The procedures for the evidentiary hearing stated that "[a]t least seven (7) days prior to the hearing, all parties involved shall exchange copies of all exhibits that will be introduced during the hearing indicating the party offering and the witness who will sponsor each.

¶33. **AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**