# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-SA-01545-COA

| | |
|---|---|
| **BETTY CAROL TAYLOR** | **APPELLANT** |

**v.**

| | |
|---|---|
| **MISSISSIPPI ENVIRONMENTAL QUALITY PERMIT BOARD AND ROBERT CURTIS ERRINGTON** | **APPELLEES** |

| | |
|---|---|
| DATE OF JUDGMENT: | 06/05/2014 |
| TRIAL JUDGE: | HON. G. CHARLES BORDIS IV |
| COURT FROM WHICH APPEALED: | GREENE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JOHN GRIFFIN JONES |
| | LEE TURNER |
| | HEWITT GRIFFIN JONES |
| ATTORNEYS FOR APPELLEES: | ROY FURRH |
| | LANNY JOE BEARD |
| | LISA THOMPSON OUZTS |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| TRIAL COURT DISPOSITION: | AFFIRMED THE DECISION OF THE MISSISSIPPI ENVIRONMENTAL QUALITY PERMIT BOARD |
| DISPOSITION: | AFFIRMED - 03/29/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., CARLTON AND JAMES, JJ.**

**JAMES, J., FOR THE COURT:**

¶1.     Betty Carol Taylor appeals from the Greene County Chancery Court's order affirming the decision of the Mississippi Environmental Quality Permit Board (Permit Board) granting a variance from the siting criteria and issuing permit coverage for the operation of a poultry farm to her brother and neighbor, Robert Curtis Errington.  Finding no error, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2.     In 1979, Errington established Errington C. Poultry Farm #2 (Errington Poultry) with three poultry houses that were constructed between 1979 and 1980. At that time, Mississippi had no regulations specifying siting criteria or otherwise requiring that poultry facilities be located a certain distance from adjoining property boundaries, residences, or businesses.

¶3.     In 1994, the Mississippi Commission on Environmental Quality (Commission) imposed siting criteria that established a buffer zone for poultry facilities constructed or modified after February 24, 1994. Poultry farms in operation before February 24, 1994, were not required to meet siting criteria or provide buffer-zone waivers from affected landowners. As a result, Errington Poultry was grandfathered into the newly enacted regulations. However, poultry facilities that generated dry litter or waste that were "constructed, significantly enlarged or altered after February 24, 1994," were required to comply with the siting criteria. Miss. Admin. Code R: 11-6.1.1.1(C)(2)(c).[1] The siting criteria established a buffer zone that required poultry facilities to be "at least 600 feet from the nearest non-owned (by the applicant) occupied dwelling or commercial establishment and 150 feet from the nearest adjoining property line." *Id.*

¶4.     On February 1, 2009, the Mississippi Department of Environmental Quality (MDEQ) issued the Dry Litter Poultry Multimedia Animal Feeding Operation General Permit (General Permit). MDEQ sent correspondence including a Notice of Intent (NOI) form to all poultry

---

[1] Effective August 26, 2013, Mississippi's environmental regulations have been renumbered and reformatted pursuant to the amended Administrative Procedures Act passed by the Mississippi State Legislature. The regulations have not been substantively changed. This opinion references the regulations by their current citations.

farmers in its database in order to give them notice to apply for coverage under the new General Permit. On March 2, 2009, Errington Poultry submitted an NOI to MDEQ for coverage under the General Permit for the operation of its existing facility. The NOI contained the following question relating to the siting criteria:

> Are all poultry houses[] that have been constructed or enlarged after February 24, 1994, at least 600 feet from all occupied dwellings or commercial establishments not owned by the applicant and at least 150 feet from all adjoining property lines?

¶5.　Errington answered "yes" to this question because Errington Poultry's houses were all constructed prior to February 24, 1994. The NOI instructed each applicant to attach completed and notarized buffer-zone waivers if the applicant answered "no" to any of the questions. The cover page of the NOI instructed applicants to submit required forms at least 180 days prior to commencing construction or planned operations. Because Errington was not planning on enlarging any of the existing houses or increasing the number of houses, he was not required to provide buffer-zone waivers from residents within the buffer zone.

¶6.　Around this time, Errington Poultry's chicken supplier, Marshall Durbin Companies, began prohibiting its poultry farmers from operating open-style poultry houses such as the three houses that Errington Poultry had been operating since its establishment. Marshall Durbin began requiring its poultry farmers to replace old open-style chicken houses with modern, closed-style poultry houses. In order to comply with this standard, Errington constructed a modern closed-style poultry house in the summer of 2010.

¶7.　On October 19, 2010, Errington submitted an updated NOI seeking to add one new poultry house to his existing facility and to demolish and replace an existing poultry house.

3

To the question on the NOI asking whether the siting criteria was met, Errington answered, "No. Attach Waiver." MDEQ had received an unnotarized buffer-zone waiver signed by Errington's mother, Iva Mae Errington, an adjoining landowner with a residence inside the buffer zone on September 23, 2010. Iva Mae Errington later submitted a notarized waiver.

¶8. On January 19, 2011, MDEQ staff performed a pre-permitting site inspection of Errington Poultry. The inspection revealed that Errington had already constructed and was operating the new poultry house that he had built during the summer of 2010. However, MDEQ staff mistakenly believed that the 2010 house was in compliance with the buffer-zone requirements. Tracy Tompkins, chief of MDEQ's Agricultural Permitting Branch, who oversaw staff who processed the permit application, testified that the site-inspection-report drawing made it appear as if Taylor's home was outside the 600-foot buffer zone. However, the actual distance between the 2010 poultry house and Taylor's home was 393 feet. Believing that no buffer-zone waiver was required from Taylor, MDEQ mistakenly issued coverage under the General Permit to Errington Poultry on March 9, 2011, for the operation of four total poultry houses, which included the proposed replacement house.

¶9. It is well documented in the record that the relationship between Errington and Taylor developed into animosity emanating from disagreements relating to Errington's choice of women that he dated. This animosity eventually culminated into a physical altercation between the two siblings on February 2, 2011. Errington claimed that as a result of the physical altercation, Taylor pressed criminal charges and pursued civil proceedings against him, including the present dispute. Taylor candidly admitted that she and Errington do not

4

get along, but stressed that their estranged relationship is not relevant to her motives in opposing Errington's permit coverage. Iva Mae disagreed, and testified that the physical altercation, which occurred at her home, was the sole reason that Taylor objected to Errington's new poultry houses. Iva Mae also testified that Taylor had never complained about Errington Poultry's operations prior to the falling out between her children.

¶10. In December 2011, Iva Mae Errington conveyed 2.3 acres of land located between Taylor's property and Errington Poultry to Taylor. Prior to the transfer, Taylor was not an adjoining landowner to Errington. After the transfer, Taylor had the property surveyed. The surveyor advised Taylor that Errington Poultry did not meet MDEQ's siting criteria. Upon learning this, Taylor contacted MDEQ in order to determine how far away a poultry house had to be from a residence. She was then advised of the 600-foot buffer zone and immediately presented a complaint to MDEQ against Errington for operating his poultry farm within the buffer zone.

¶11. On December 19, 2011, MDEQ conducted a compliance inspection to evaluate Errington's compliance with the permit that had been issued on March 9, 2011. During the inspection, MDEQ staff discovered that Errington had not obtained all the required buffer-zone waivers. At the time of the inspection, there were two older poultry houses on site, the new fully constructed 2010 poultry house 393 feet from Taylor's home, and a replacement house under construction. The replacement house under construction was approximately 295 feet from the Taylor's home. Neither the 2010 house nor the replacement house met the siting criteria because they fell within the 600-foot buffer zone.

5

¶12. William Rider, a compliance and enforcement staff member of MDEQ, informed Errington that his 2010 poultry house and replacement house appeared to be within the buffer zone. Rider asked Errington if he could suspend construction of the replacement house until the buffer-zone issue was resolved. Errington responded that he could not halt construction because the construction had been paid in advance. Rider informed Errington that he would be constructing the replacement house at his own risk, and there was a possibility that he would be unable to operate it at that location.

¶13. On December 21, 2011, Taylor sent correspondence to Tompkins and the Permit Board, stating that she had not received a buffer-zone waiver and that she would be unwilling to sign a waiver. She also objected to any variances being granted to Errington. On January 8, 2012, Taylor sent additional correspondence to Tompkins and the Permit Board reiterating her objections and requesting that Errington's existing permit be revoked.

¶14. Before December 2011, MDEQ had not received a complaint from Taylor or any other individual against Errington Poultry since its inception in 1979. In January 2012, Errington submitted notarized buffer-zone waivers signed by Van Elmore and Iva Mae Errington, who were adjoining landowners within the buffer zone. Errington claimed that he misread the buffer-zone waiver's language when he began construction of his 2010 poultry house. He understood the buffer zone to be 150 feet from each adjoining property owner, rather than 600 feet from all residences. Because of this misunderstanding, Errington initially only sought buffer-zone waivers from Elmore and Iva Mae. He explained that his failure was an

6

honest mistake and that he did not intentionally attempt to circumvent any MDEQ regulations.

¶15. On May 7, 2012, Errington requested that the Permit Board grant a waiver or variance for the two new poultry houses that did not meet the siting criteria. On May 8, 2012, MDEQ staff presented the matter to the Permit Board with the recommendation that a variance be granted to Errington. After a preliminary hearing, the Permit Board denied the variance request and unanimously voted to revoke Errington's coverage. Errington timely requested a formal evidentiary hearing, and filed another motion specifically requesting that the Permit Board grant a variance under Mississippi Administrative Code Rule 11-6:1.1.1(C)(2)(f). Taylor and her husband, Clifton Taylor, moved to intervene and were allowed to participate in the formal evidentiary hearing. MDEQ staff did not make a recommendation at the formal evidentiary hearing, which was held on September 11, 2012.

¶16. Taylor submitted prefiled testimony and testified at the hearing. Taylor built her home in 1983. Taylor testified that there were no poultry houses next to her home at that time. However, a warranty deed and a real-estate deed of trust reflecting the first mortgage confirmed that Errington Poultry was in operation before Taylor first built her home. The testimony of Errington and Iva Mae Errington also corroborated that Errington Poultry was in operation before Taylor first built her home. After Taylor's home burned down on March 8, 2008, she rebuilt a larger home in the same location a few months later.

¶17. Taylor, who owns a small chicken coop with approximately thirty chickens approximately 193 feet from her house, testified that the noise, dust, flies, and odor from

7

Errington Poultry were worse with the two newly constructed, larger, modern, closed-style poultry houses. Taylor testified that the noise, dust, flies, and odor made it impossible to enjoy her home. Taylor also claimed that the value of their home had decreased because of the new poultry houses. Taylor's husband, Clifton Taylor, echoed her testimony.[2]

¶18. Errington presented evidence at the hearing showing that although the modern closed-style houses are larger, they are also quieter, drier, and cleaner than the old open-style houses. At the time of the hearing, the two remaining open-style houses were no longer in service. Only the two new modern closed-style houses were in operation. The exhaust fans for the 2010 house and replacement house are located away from Taylor's home, and blow away from her home toward Elmore's property. The fans on the open-style houses blew toward Taylor's home.

¶19. Elmore, who does not have a residence within the buffer zone and primarily uses his property for recreational purposes and growing timber, testified that the odor from the older open-style poultry houses was worse. He acknowledged that there were flies, but he did not notice anything out of the ordinary. Elmore also testified that he could smell the new poultry houses when the fans are blowing occasionally, but stated that the new houses did not reek like the older houses, especially during rainy weather conditions.

¶20. After a full review of all the evidence presented and hearing testimony at the formal evidentiary hearing, the Permit Board reversed the revocation of coverage under the General

---

[2] Taylor and her husband had their home appraised as a part of a separate civil suit they filed sometime in late 2011 in chancery court seeking a permanent injunction against Errington's poultry operation. The status or disposition of that lawsuit is not reflected in the record.

Permit to Errington Poultry. The Permit Board granted a variance from the siting criteria to Errington Poultry, and reinstated coverage for the 2010 poultry house as well as the replacement house. Taylor appealed the decision to the chancery court. The chancery court affirmed the decision of the Permit Board. The chancery court found that the Permit Board acted as a fair-minded fact-finder, and that the decision it reached was supported by substantial evidence. The chancery court also found that the Permit Board's decision was neither arbitrary nor capricious. The chancery court also denied Taylor's motion for reconsideration or, alternatively, for a rehearing.

¶21. Taylor now appeals to this Court raising the following assignments of error: (1) the Permit Board erred by granting a variance to Errington because he did not provide 180 days' notice to MDEQ prior to the construction of his poultry houses and operated his poultry houses without coverage under the General Permit; (2) the Permit Board erred because there was an absence of sufficient proof that Taylor had timely and sufficient notice of the proposed facilities; and (3) the Permit Board's decision was arbitrary and capricious because it improperly applied the regulatory factors in considering whether to grant a variance from the siting criteria. Finding no error, we affirm.

## STANDARD OF REVIEW

¶22. The Mississippi Supreme Court has summarized the standard for reviewing a decision of an administrative agency as follows:

> An administrative appeal is not a means to have a court re-weigh evidence and reach a different conclusion. And a permit from an administrative agency is not an authorization to operate a nuisance. A court performs two different functions when determining whether to enjoin a permitted operation as a

9

nuisance and when determining to reverse or affirm an administrative decision. The court must respect that difference. An equity suit is fact driven. An administrative appeal is law driven. Both proceedings are ultimately public policy driven. And public policy is uniquely fitted for the legislature. The legislature has delegated the permitting decision to the Permit Board.

*Sierra Club v. Miss. Envtl. Quality Permit Bd.*, 943 So. 2d 673, 677 (¶10) (Miss. 2006).

¶23. "Appeals from the Permit Board 'shall be considered only upon the record as made before the Permit Board.'" *Riverbend Utilities Inc. v. Miss. Envtl. Quality Permit Bd.*, 130 So. 3d 1096, 1101 (¶12) (Miss. 2014) (quoting Miss. Code Ann. § 49-17-29(5)(b) (Rev. 2015)). Matters of law will be reviewed de novo, with great deference afforded to an administrative agency's construction of its own rules and regulations and the statutes under which it operates. *Sierra Club,* 943 So. 2d at 678 (¶10). "Generally, trial courts and appellate courts will reverse the decision of an administrative agency only if the decision (1) was unsupported by substantial evidence; (2) was arbitrary and capricious; (3) was beyond the power of the administrative agency to make; or (4) violated the complaining party's statutory or constitutional right." *Riverbend Utilities*, 130 So. 3d at 1101 (¶12) (citing *W.C. Fore v. Miss. Dep't of Revenue*, 90 So. 3d 572, 577 (¶12) (Miss. 2012)).

¶24. "An action is arbitrary or capricious if the agency entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sierra Club,* 943 So. 2d at 678 (¶11). Moreover, "[a] rebuttable presumption exists in favor of agency decisions, and this Court may not substitute its own judgment for that of the agency." *Id.*

10

**DISCUSSION**

¶25.	The Permit Board, created under Mississippi Code Annotated section 49-17-28(1) (Rev. 2012), has the power to take action on permits administered through MDEQ. *Miss. Comm'n on Envtl. Quality v. Bell Utilities of Miss. LLC*, 135 So. 3d 868, 871 (¶2) (Miss. 2014). Mississippi Code Annotated section 49-17-29(3)(a) (Rev. 2012) provides that "the Permit Board created by Section 49-17-28 shall be the exclusive administrative body to make decisions on permit issuance, reissuance, denial, modification or revocation of air pollution control and water pollution control permits and permits required under the Solid Wastes Disposal Law of 1974 (Title 17, Chapter 17), and all other permits within the jurisdiction of the Permit Board."

> **I.	Errington's failure to provide 180 days' notice and his construction and operation of a poultry house without a valid permit does not preclude the Permit Board from granting a variance and issuing permit coverage.**

¶26.	Taylor argues that Errington failed to file a valid NOI seeking permission to construct and operate his new poultry houses at least 180 days prior to first commencing construction and operations. Taylor also argues that Errington's construction and operation of his poultry facility without valid permit coverage was a violation of state law that rendered his permit coverage void. Taylor contends that these violations should have precluded the grant of a variance and issuance of permit coverage to Errington.

¶27.	Taylor refers to the following regulation containing the 180-day provision:

> Any person proposing a discharge of wastes to waters of the State or proposing a treatment works from which no discharge of wastes is designed to occur shall file an application in the case of an individual NPDES, UIC, or State

11

permit, at least 180 days prior to the commencement of the activity or, in the case of NOI for coverage under an issued NPDES general permit or coverage under an issued State general permit, in accordance with a schedule established in such permit.

Miss. Admin. Code R. 11-6:1.1.1(B)(1).

¶28. This case involves an NOI for coverage under an issued state general permit. The NOI received by Errington established the following schedule on its cover page: "Submit at least 180 days prior to commencement of construction or planned operations." Errington did not submit an NOI 180 days prior to commencing construction of his 2010 poultry house.

¶29. The NOI form also provides: "Engaging in construction activities that disturb one or more acres of land without a modified coverage or issuance of an individual permit is a violation of state law." Errington's construction and operation of his two new poultry houses without valid permit coverage was a violation of state law. Taylor argues that the Permit Board ignored Errington's violations and failed to follow governing statutes and rules, resulting in an arbitrary and capricious decision.

¶30. However, the Permit Board did consider Errington's noncompliance and acted within its authority in granting a variance and reinstating permit coverage under Rule 11-6:1.1.1(C)(2)(c), which allows the Permit Board to consider requests for exceptions or variances from the siting criteria. The governing statutes and regulations do not prohibit the Permit Board from issuing coverage under the General Permit if an NOI is not filed 180 days prior to the commencement of the construction or planned operation. The Permit Board properly considered Errington's compliance history and any other aspect of his history it deemed necessary or appropriate in the issuance or denial of permit coverage. *See* Miss.

Admin. Code R. 11-6:1.1.3(H)(1). Specifically, Mississippi Administrative Code Rule 11-6:1.1.3(H)(1) provides:

> H. Permit Board Determinations, Issuance or Denial of Permits.
>
> > (1) In considering an application for a permit issuance or transfer, the Permit Board may consider the applicant's compliance history, financial capability, financial responsibility, or any other aspect of the applicant's history it deems necessary or appropriate.

¶31. While the Permit Board acknowledged Errington's noncompliance, it also recognized that Taylor's complaint was the first complaint it had ever received regarding Errington Poultry in its over thirty-year history of poultry operations. Although pertinent to Errington's compliance history, the Permit Board determined that failing to comply with the 180-day notice provision did not preclude Errington from applying for a variance and obtaining coverage under the General Permit.

¶32. The Permit Board also considered Errington's unlawful operation of the 2010 poultry house within the buffer zone without obtaining a waiver from Taylor. Again, the Permit Board did not find that Errington's violation precluded him from applying for and obtaining permit coverage. Errington testified that he did not seek a buffer-zone waiver from Taylor because he misread the buffer-zone requirement. MDEQ mistakenly issued a permit coverage to Errington for the operation of his 2010 poultry house and for the construction of the proposed replacement house. Relying on this permit, Errington continued to operate the 2010 poultry house and began construction of the replacement house based on what he believed was valid permit coverage. Certainly, the Permit Board considered its own mistake

13

in issuing coverage and Errington's reliance on the erroneously issued permit. The Permit Board acknowledged that Errington continued construction at his own risk after being notified of buffer-zone issues, but also it considered the financial consequences that he faced had he halted construction.

¶33. That is not to say Errington's violations are without potentially severe consequences. The Commission may penalize an individual for violation of the environmental laws and regulations. Under Mississippi Code Annotated section 49-17-43 (Rev. 2012), any person found by the Commission violating any of the statutory provisions or any rule or regulation shall be subject to a civil penalty of not more than $25,000, for each violation following a hearing. While the penalty is potentially severe, the regulations and statutes do not prohibit a violator from receiving a variance or permit coverage by the Permit Board.

¶34. We cannot say that the Permit Board's decision was arbitrary and capricious. The Permit Board appropriately considered Errington's entire compliance history along with other aspects of Errington's history that it deemed appropriate prior to granting a variance and reinstating coverage as permitted by Rule 11-6:1.1.3(H)(1). The Permit Board is specifically authorized to grant requests for exceptions to or variances from the buffer-zone requirements under Rule 11-6:1.1.1(C)(2)(c). An agency is "better equipped, and possess[es] the required expertise[,] to consider and adopt rules and regulations." *Miss. Dep't of Envtl. Quality v. Weems*, 653 So. 2d 266, 273 (Miss. 1995). Accordingly, we find that the Permit Board did not err as a matter of law by granting the variance and issuing coverage.

14

**II. The record contains sufficient proof that timely and sufficient notice was given to Taylor in order to challenge the grant of a variance and issuance of coverage.**

¶35. Taylor claims that the Permit Board erred by considering Errington's request for a variance because there was an absence of sufficient proof that she received timely and sufficient notice under Rule 11-6:1.1.1(C)(2)(f). Because of this alleged absence, Taylor contends that the Permit Board's decision was arbitrary and capricious.

¶36. The regulations give the Permit Board discretion to grant an exception or variance from the siting criteria upon sufficient proof that affected property owners had timely and sufficient notice under Rule 11-6:1.1.1(C)(2)(f), which provides:

> In the event the buffer zone requirements specified in Rule 1.1.1.C.2.a and c. above cannot be met[,] the Permit Board will consider requests for exceptions to, or variances from, such requirements upon sufficient proof that affected property owners within the subject buffer zone have had timely and sufficient notice of the proposed facility. The buffer zone requirement may be waived by written permission issued by the affected property owners. Any comments received as a result of such notice shall be considered prior to action upon any request for exceptions to, or variances from, the buffer zone requirements. At all times a minimum 10 foot buffer zone is required. The Permit Board may consider the following factors in deciding whether or not a variance and/or exception should be granted:
>
> > (1) whether a person and/or facility moves within the buffer zone of a treatment facility, previously approved by the Permit Board;
> >
> > (2) the type of land disposal techniques employed, including, but not limited to, subsurface injection of wastes, and the utilization of spray irrigation; and/or
> >
> > (3) such other factors as the Permit Board deems appropriate.

¶37. Taylor argues that she did not receive any notice whatsoever of Errington's proposed facilities. What constitutes "sufficient proof" of "timely and sufficient notice" is not specifically defined within the regulations. Nonetheless, we find the record contains sufficient proof that Taylor had timely and sufficient notice that Errington was constructing a new poultry house in 2010 and replacing another within the buffer zone.

¶38. In Taylor's prefiled testimony, she stated that "Errington constructed and began operating a 500 ft. x 50 ft. chicken house 393 feet from our home." Taylor described that these new "much larger" poultry houses were right outside her front door and immediately next to her home. Obviously, Taylor observed Errington undertaking the construction of the much larger 2010 poultry house 393 feet away from her home. Likewise, she observed the demolition and construction of another much larger replacement house 279 feet away from her home. Taylor also testified that she was aware that Marshall Durbin had required Errington to shut down other poultry houses that he owned several miles from Errington Poultry. She was aware that Errington Poultry's old open-style houses would be shut down as well. However, Taylor, who admitted she was familiar with the poultry business, waited until December 2011 to present her very first complaint against Errington Poultry to MDEQ despite living next to the facility since 1983.

¶39. Taylor received sufficient notice allowing her ample opportunity to submit a complaint to MDEQ and present her objections to the Permit Board, a fair and impartial tribunal. Her complaint was initially successful following a preliminary hearing where Errington's variance request was denied and permit coverage was revoked. Taylor was also

16

able to intervene and fully participate in the formal evidentiary hearing before the Permit Board. Taylor, who was represented by counsel, presented arguments, introduced evidence, presented testimony, and cross-examined witnesses as allowed under the statute. She was able to appeal the Permit Board's decision to the chancery court. She was not impeded from meaningfully challenging Errington's variance request and permit coverage under the procedures set forth in section 49-17-29(4)-(5). This assignment of error is without merit.

### III. The Permit Board's application of the regulatory factors was not arbitrary or capricious and was supported by substantial evidence.

¶40. Taylor argues that the Permit Board erred in the application of the three factors found in Rule 11-6:1.1.1(C)(2)(f)(1)-(3) to the facts presented, resulting in an arbitrary and capricious decision. Specifically, Taylor contends that the Permit Board ignored Errington's failure to comply with all of the legal requirements applicable to poultry operations and considered irrelevant evidence, such as the financial impact on Errington and personal issues between her and Errington.

¶41. In determining whether to grant a variance, the Permit Board considered the following factors: (1) whether a person or facility moves within the buffer zone of a previously approved facility; (2) the type of land disposal techniques employed at the site; and (3) such other factors the Permit Board deems appropriate. Miss. Admin. Code 11-6:1.1.1(C)(2)(f)(1)-(3). Moreover, Rule 11-6:1.1.1(C)(2)(c) provides, in part:

> In the event new treatment facilities are proposed for an existing confined animal operation, the Permit Board will consider requests for exceptions to, or variances from, the buffer zone requirements, and the requirements of Rule 1.1.1.C.2.e., based upon such factors as the relative distances and age of the existing operation.

17

¶42. The Permit Board had the discretion to grant an exception or variance from the regulatory siting criteria upon sufficient proof that affected property owners had timely and sufficient notice under Rule 11-6:1.1.1(C)(2)(f). We have determined that the record contains sufficient proof that Taylor received timely and sufficient notice to challenge Errington's variance request. Contrary to Taylor's assertions, the Permit Board considered Errington's failure to provide 180 days' notice as well as his unlawful construction and operation of a poultry facility without a valid permit.

¶43. Taylor argues that the first factor was inapplicable because she did not move into a buffer zone because no buffer zone existed at the time she first built her home and the existing facility at that time was not previously approved. Although no regulations existed establishing a buffer zone at that time, Taylor built her home in 1983 within 600 feet of an existing poultry facility that would be grandfathered into the regulations enacted in 1994. Following a house fire, Taylor rebuilt her home in 2008 in the same location within 600 feet of an existing poultry facility that had been previously approved by MDEQ. Regardless of whether the first factor strictly applies to only poultry operations in existence that were approved after the buffer zone was established in 1994, Taylor's initial construction of her home within 600 feet of an existing facility may be considered under any "other factors as the Permit Board deems appropriate." Miss. Admin. Code R. 11-6:1.1.1(C)(2)(f)(3).

¶44. Taylor also argues that the Permit Board placed undue emphasis on her motives and the financial impact on Errington. The third factor of Rule 11-6:1.1.1(C)(2)(f)(1) is any "other factors as the Permit Board deems appropriate." Thus, it was proper to consider the

18

motives of Taylor. It was also proper to consider the financial impact on Errington. Rule 11-6:1.1.3(H)(1) expressly states that the applicant's compliance history and financial responsibility may be considered. We agree with the chancery court's finding:

> While it may be true that the Permit Board considered personal differences between Errington and Taylor, it is also true that the Permit Board considered many other factors, including, but not limited to, the time Errington has been in business, [the] length of time Taylor has resided within 600 feet of the poultry operation[,] and the fact that Errington was issued a permit on March 9, 2011.

¶45. Essentially, Taylor's argument is that the Permit Board improperly weighed the evidence when it applied the regulatory factors. However, this Court will not reweigh the facts, nor substitute its judgment for that of the Permit Board. *Hinds Cty. v. Miss. Comm'n on Envtl. Quality*, 61 So. 3d 877, 881 (¶10) (Miss. 2011). This Court is concerned only with the reasonableness of the Permit Board's decision, not its correctness. *Weems*, 653 So. 2d at 281. This Court is "only to determine whether substantial evidence supports the agency's decision and whether the agency exercised its discretion reasonably and with due consideration." *Id.* at 280. "Substantial evidence is more than a mere scintilla of evidence or something less than a preponderance of the evidence but more than a scintilla or glimmer." *Hinds Cty.*, 61 So. 3d at 885 n.6 (quotation marks omitted). We find that there is substantial evidence to support the Permit Board's decision, and it exercised its discretion reasonably and with due consideration. In applying the regulatory factors to the evidence, the Permit Board issued a well-reasoned and thorough basis for its decision, which stated in part:

> The Permit Board considered testimony that Errington Poultry built its first three poultry houses on the site in 1979 and 1980 and that Ms. Taylor built her first house in 1983. When Ms. Taylor's house burned down in 2008, Ms.

19

Taylor rebuilt her home in the same location. The Permit Board concludes, based on testimony and documentary evidence, that Errington Poultry began its operations prior to Ms. Taylor's building her home. The Permit Board also considered testimony that while Errington Poultry planned to land-apply the dry litter waste from the facility, it planned to apply the waste on the property away from the Taylors' residence. Finally, the Permit Board considered the testimony that the Taylors' opposition to Errington Poultry arose after the personal difficulties arose and a physical altercation ensued between Ms. Taylor and Mr. Errington. The Permit Board considers this as an appropriate "other factor" supporting its decision to grant a variance to Errington Poultry. Considering that Errington Poultry has operated since 1979 with no complaints until 2011 and that Ms. Taylor moved within the buffer zone twice after Errington Poultry began operation, the Permit Board concludes, based on supporting evidence, that the regulatory factors for granting an exception or variance from the siting criteria have been met.

¶46. The Permit Board considered all relevant evidence, including, but not limited to, Errington's compliance and noncompliance with the law; the age of Errington's operation; the distance between Taylor's home and the poultry houses; family issues; the length of time Taylor resided in her house; the motivation for each party to litigate; Taylor's knowledge of the poultry business; the motivation of Errington to place the new poultry houses in their current location; the technological advances of the new poultry houses; the mistakenly issued permit coverage; Errington's reliance on the mistake; and financial consequences. We find that the Permit Board's application of the regulatory factors was not arbitrary or capricious and was supported by substantial evidence.

## CONCLUSION

¶47. Although Errington was operating his facility in violation of the siting criteria's established buffer zone, the Permit Board had authority to grant a variance and issue coverage under the General Permit. The Permit Board's decision was not arbitrary and

20

capricious and was supported by substantial evidence. Thus, we affirm the judgment of the Greene County Chancery Court affirming the decision of the Mississippi Environmental Quality Permit Board.

¶48. **THE JUDGMENT OF THE CHANCERY COURT OF GREENE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR, WILSON AND GREENLEE, JJ., CONCUR.**